CRANE IRON WORKS v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al., Interveners).

(Commerce Court. June 7, 1912.)

No. 55.

1. COMMERCE (§ 95*)—INTERSTATE COMMERCE COMMISSION—ESTABLISHING JOINT RATES—DISCRETION—REVIEW.

The power conferred on the Interstate Commerce Commission by the Interstate Commerce Act Feb. 4, 1887, c. 104, § 15, 24 Stat. 384, as amended by Act June 18, 1910, c. 309, § 12, 36 Stat. 551 (U. S. Comp. St. Supp. 1911, p. 1299), to establish joint rates, is discretionary, and its refusal to establish such a rate is within its discretion, and not reviewable by the Commerce Court.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 145; Dec. Dig. § 95.*]

2. CARRIERS (§ 33*)—COMMON CARRIERS—PLANT FACILITIES.

Plant facilities in the way of railroad tracks and engines installed by an iron company and used in moving cars between different parts of the plant, and to and from an exchange track connecting on the grounds of the company with the track of an interstate railroad, did not cease to be such facilities as to the iron works by the fact that they were transferred to a separate corporation incorporated as a railroad company under the laws of the state, nor because the tracks were extended and with the equipment also used in moving cars between the exchange track and other nearby industries, in which service the company became a common carrier under the laws of the state, and the through railroad is under no legal obligation to pay such company for switching services rendered to the iron works, whose duty it is to receive and deliver its cars at the exchange track, even though the through road pays for such services when rendered to the other connecting plants.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 86–90; Dec. Dig. § 33.*]

In Equity. Suit by the Crane Iron Works, petitioner, against the United States, respondent, and the Interstate Commerce Commission and others, interveners. On motions to dismiss petition. Motions granted.

For opinions of Interstate Commerce Commission, see 15 Interst. Com. Com'n R. 248, and 17 Interst. Com. Com'n R. 514.

William A. Glasgow, Jr., of Philadelphia, Pa., and Cyrus G. Derr, of Reading, Pa. (Charles F. Diggs, of Washington, D. C., on the brief), for petitioner.

Winfred T. Denison, Asst. Atty. Gen., of Washington, D. C. (Thurlow M. Gordon, Special Asst. Atty. Gen., of Washington, D. C., on the brief), for the United States.

P. J. Farrell, of Washington, D. C., for the Interstate Commerce Commission.

Jackson E. Reynolds, of New York City, for the Central Railroad Company of New Jersey, intervener.

Before KNAPP, Presiding Judge, and ARCHBALD, CARLAND, and MACK, Associate Judges.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

KNAPP, Presiding Judge. The petitioner in this case, the Crane Iron Works, instituted proceedings before the Interstate Commerce Commission against the Central Railroad Company of New Jersey and the Crane Railroad Company to procure an order requiring the defendant railroads to establish through routes and joint rates on certain commodities between points on the Crane Railroad and points in the state of New Jersey on the lines of the Central Railroad; and also for reparation on account of previous shipments. After full hearing, the Commission made a report (17 Interst. Com. Com'n R. 514) to the effect that petitioner was not entitled to the relief sought, and thereupon entered an order dismissing the proceedings. Thereafter this suit was brought to set aside and annul the Commission's order of dismissal on grounds which will be hereafter stated. The United States filed a motion to dismiss on the ground that the petition did not state a cause of action, and a like motion to dismiss was filed by the Commission which had intervened. On these motions the case has been argued and submitted.

There had been a previous application to the Commission for the same purpose by the Crane Railroad Company, which the Commission also dismissed, as appears by its report and order therein. 15 Interst. Com. Com'n R. 248. Both reports are attached to and made a part of the petition now before us, and from these reports and the petition itself the following facts appear:

The petitioner is a corporation organized under the laws of Pennsylvania, and located in the borough of Catasauqua, in that state. It was incorporated about the year 1895 for the purpose of acquiring the plant and property of the Crane Iron Company, which had for many years carried on the business denoted by its name. At that time the plant consisted of three blast furnaces, together with appurtenant buildings, storage bins, etc., and a private railroad connected with the works. It does not appear when this railroad was constructed, or when it was extended to connect with exchange tracks of the Central Railroad and other long-line carriers; but it does appear to have been in use for the purposes of the iron plant for more than 30 years.

In the operation of this plant, it is necessary to transport loaded cars received by rail to various points within the limits of the plant for unloading, to transport cars which have been loaded with its product from various points within the plant to the line of railway by which they are taken to destination, and also to some extent necessary to move cars from point to point within the plant itself. For these purposes, the iron works long ago laid down rails extending from a connection with the Central Railroad to the various points within its plant where cars were to be placed. The line of the Central Railroad extends through the premises of the iron works and the point where the two railroads connect is now and always has been upon the iron works' land. The iron works also provided the necessary locomotives for operating the various tracks which it had built to accommodate the needs of its plant. In actual operation loaded cars destined for the iron works were placed by the Central Railroad upon a track known as the exchange track, from which they were taken by the locomotives

of the iron works and hauled to the required point within its plant. When cars were loaded for movement out, they were taken by the same locomotives and placed upon the exchange track, where the Central Railroad received and transported them to destination. These locomotives were also used for moving cars from point to point within the plant as might be desired.

For this service the petitioner has never received, and, until the organization of the Crane Railroad, had never claimed that it should receive, compensation from the Central Railroad. Indeed, it seems to have been assumed that these tracks and engines were a necessary part of the plant of the iron works whose business could not be properly carried on without them.

In process of time a few other industries, perhaps half a dozen, were located in close proximity to the premises of the iron works, though not upon its land, and these industries were so situated that loaded cars could be transported between the tracks of the Central Railroad and the industry only over the rails of the Crane Iron Works. For the purpose of serving these industries, the Crane Iron Works extended its rails beyond its own land to these several plants. Cars for these industries were placed upon the same track with those intended for the iron works and taken by the locomotives of the iron works over the rails of that company to the several industries. For this service the iron works made a charge to the industry which seems to have been usually $2 a car. The different railroads bringing these cars to Catasauqua, including the Central Railroad, paid to the iron works towards defraying this charge at first five cents and subsequently six cents per ton. This condition seems to have continued for many years, during which time, as above stated, the iron works neither claimed nor received any compensation for handling its own freight.

Under the statutes of Pennsylvania a private railroad cannot connect with a public railroad except for handling the business of the owners of the private railroad, and the iron works was advised that it had no lawful right to perform this switching service for the other industries. Accordingly, in 1905, the Crane Railroad Company was incorporated, and the tracks and other property used by the iron works in connection with its railroad were conveyed to the Crane Railroad Company, together with a strip of land 10 feet wide wherever its rails were laid upon the land of the iron works, and also whatever rights of way it might have in reaching the other industries in question. The capital stock of both the Crane Iron Works and the Crane Railroad Company is owned by the Empire Iron & Steel Company, and the management of the Crane Railroad Company after the incorporation continued in the same manner as before, although the operating accounts of the two companies were kept entirely separate.

Although the Crane Railroad Company was organized in 1905, it did not begin business on its own account until the following year, since which time it has charged both to the other industries and to the Crane Iron Works $2 per car for this switching service, and it is insisted that the various railroads entering Catasauqua should absorb this switching charge. The Central Railroad has declined to make

any allowance on account of cars handled for the Crane Iron Works, but has made an allowance of six cents per ton on traffic consigned to or from the other industries.

The principal contention of petitioner appears to be that the Crane Railroad Company is a common carrier subject to the provisions of the act to regulate commerce and the jurisdiction of the Commission; that this was conclusively established by the evidence before the Commission; that the Commission in failing to find the fact accordingly and leaving it undetermined committed an error of law; that as such common carrier the Crane Railroad Company is legally entitled to compensation for the transportation service which it is alleged to perform for petitioner; and that, therefore, it was error of law for the Commission to refuse the relief which the petitioner sought to secure. Incidentally, and in support of the main contention, it is further claimed that the dismissal order was erroneous because the undisputed evidence established as matter of law unjust discrimination on the part of the Central Railroad of New Jersey, in that it pays the Crane Railroad, out of the tariff charge which it collects, for transporting cars to and from the other industries located on the tracks of the Crane Railroad, but refuses to pay anything for transporting cars to or from the Crane Iron Works.

The Crane Railroad Company is organized under the railroad law of Pennsylvania, which, among other things, declares that all railroads so organized shall be common carriers. In that state it has undoubtedly the legal status of a common carrier, with such privileges and obligations as pertain to railroad corporations in Pennsylvania. It is not necessary to discuss whether the Crane Railroad is in fact a common carrier within the meaning of that term as used in the act to regulate commerce, because we shall assume for the purposes of this case that it is a common carrier subject to the act, and the matters in dispute will be decided on that assumption.

But, granting all that is claimed in this regard, it does not follow, as we think, that petitioner is therefore entitled to have joint rates established, or that the dismissal order of the Commission is for any reason unlawful. The substantive basis of petitioner's contention is the following provision in the first section of the act (Act Feb. 4, 1887, c. 104, 24 Stat. 379, as amended by Act June 18, 1910, c. 309, § 7, 36 Stat. 544 [U. S. Comp. St. Supp. 1911, p. 1285]):

"And it shall be the duty of every carrier subject to the provisions of this act * * * to establish through routes and just and reasonable rates applicable thereto."

It will be observed that the obligation to establish "joint rates" is not imposed, but only the obligation to establish "through routes," with just and reasonable rates applicable thereto. Undoubtedly, connecting carriers are required to facilitate the movement of traffic by providing through routes, but the application of joint rates to such routes is not obligatory except as required by the Commission after notice and hearing. If through routes are voluntary established, the rates fixed for transportation over such routes are subject to the regulating power of the Commission; and the Commission may require joint rates to

be provided, fixing the amount thereof and the divisions between the several carriers when they are unable to agree among themselves.

If the Crane Railroad be regarded as performing the service of a public carrier, a service which the shipper is not required to provide, and not a private service which the shipper must furnish at its own expense, we see no reason to doubt upon the facts now disclosed that through routes in this case have been provided and are in full operation. All the facilities of interchange and through movement are in current use, and traffic, in fact, moves freely from points on one road to points on the other. Indeed, we do not perceive that anything more or different could be done by either road to bring about the physical conditions and incidents which constitute through routes.

[1] The authority of the Commission to require joint rates is found in a paragraph in the fifteenth section of the act, which reads as follows:

"The Commission may also, after hearing, on a complaint or upon its own initiative without complaint, establish through routes and joint classifications, and may establish joint rates as the maximum to be charged and may prescribe the division of such rates as hereinbefore provided and the terms and conditions under which such through routes shall be operated whenever the carriers themselves shall have refused or neglected to establish voluntarily such through routes or joint classifications or joint rates; and this provision shall apply when one of the connecting carriers is a water line."

That this invests the Commission with discretionary power, and was so intended, cannot be seriously doubted. Not only is the grant of authority permissive in form, but the entire paragraph contemplates the exercise of judgment upon the facts disclosed, and implies the right and duty of the Commission to order or decline to order joint rates, as the circumstances and conditions developed in each inquiry may seem to require. The provision for a hearing upon complaint, or the equivalent initiative of the Commission, involves the liberty and obligation of the administrative tribunal to decide a controversy of this nature upon its merits with due regard to the interests of both shippers and carriers. In short, it seems clear to us that the question of establishing joint rates or declining to do so rests in the discretion of the Commission, and it is equally clear that the refusal of the Commission in this case was a lawful and proper exercise of that discretion.

[2] But the dismissal order in question rests upon another basis, which will be briefly considered. Upon all the circumstances connected with the location, construction, and operation of the Crane Railroad, the Commission found as an ultimate fact that, as to the Crane Iron Works, it was a mere plant facility, performing services which the iron works should perform for itself if it desired such services, and that the Central Railroad was under no obligation to pay the Crane Railroad for the switching service which it performs for the iron works, and, indeed, could not lawfully do so. We see no reason to doubt the correctness of this conclusion. The Commission had previously pointed out the distinction between those operations which constitute a plant facility and the legitimate services of a common carrier (General Electric Company v. N. Y. C. & H. R. R. R. Co. et al., 14

Interst. Com. Com'n R. 237; Solvay Process Company v. D., L. & W. R. R. Co., 14 Interst. Com. Com'n R. 246), and the observations made in these illustrative cases seem to us to express a sound and wholesome principle. That there was substantial evidence to sustain the finding of the Commission as to the character of the services rendered is not open to reasonable question, and, this being so, the conclusion must be accepted accordingly.

But the argument is earnestly pressed that such a relation cannot as matter of law be predicated of an incorporated railroad which is declared to be a common carrier by the fundamental law of the state of its creation. In other words, it is insisted that the Crane Railroad, being in law a common carrier and performing the functions of a common carrier, cannot be a plant facility of the Crane Iron Works, but must be regarded as a common carrier for the Crane Iron Works, and entitled as a matter of legal right to a just share of the transportation charge which the Central Railroad makes and collects for carrying the traffic of the iron works; and on this theory it is argued that the finding and conclusion of the Commission involve an error of law which this court should correct.

We are constrained to reject this contention. Whether the Crane Railroad is a plant facility as to the Crane Iron Works or a common carrier of the traffic of that concern must be held to be a question of fact which is not affected by the circumstance of incorporation. We understand it to be admitted that the operations of this railroad when it was owned and operated by the iron works were the operations of a plant facility. It is contended, however, when the railroad was separately incorporated and passed from the ownership of the iron works, that its relation to the latter and the legal character of its services became immediately changed. That is to say, the mere fact of the separation of ownership and the transfer of the title and control of the railroad property to a new corporation, although there was not the slightest change in what was actually done, operated in legal effect to transform a plant facility into a common carrier and to impose obligations on the Central Railroad, as to the traffic of the iron works, which it could not theretofore have been required to assume. We cannot believe that any such result was accomplished. The rights and duties of the Central Railroad respecting the iron works could not thus be altered. If its obligations as a common carrier were fully discharged and its tariff rate earned by delivering cars to and taking them from the exchange tracks before the iron works parted with its railroad, its rights and duties respecting that concern were neither increased nor diminished by the creation of the Crane Railroad. The services rendered to the iron works continuing to be precisely the same in point of fact, this railroad continued to be utilized as the facility of the iron works' plant in the same way after as before incorporation.

Nor do we perceive any serious objection to regarding a given agency as a plant facility of a particular shipper, although a common carrier as to other shippers. Whether considered from the standpoint of law or of practical administration, it seems reasonable to hold, as

the Commission virtually held in this case, that a railroad of the kind in question may have this dual character and perform services for one concern which are not the services of a common carrier, but which that concern is bound to provide for itself, notwithstanding it occupies the relation of a common carrier to other concerns and the public generally. Concededly, the work which the Crane Railroad does in moving cars between different points in the iron works' plant has none of the incidents of common carriage, and why may not the same thing be affirmed of the work it does in switching cars for the iron works to and from the exchange track with the Central Railroad, even if the work it does for the other industries makes it as to them or the shippers of Catasauqua a common carrier?

It is unnecessary to discuss the charge of discrimination except to say that the Commission has found, upon evidence which is clearly substantial, that the refusal of the Central Railroad to pay switching charges on traffic handled for the iron works, while at the same time paying switching charges on traffic handled for the other industries, is not an undue prejudice to the one or an undue preference to the others.

In the concluding paragraph of the report upon which the dismissal order is based the Commission summarizes the situation as follows:

"The complaint attacks certain rates as unreasonable, and asks for the establishment of certain joint rates between definite points. The complainant [petitioner] does not contend that these rates are unreasonable except by the amount of this switching charge, nor does it ask for the establishment of joint rates except for the purpose of compelling the defendant [Central Railroad] to pay the Crane Railroad for the performance of this switching service. Since we hold that the delivery by the defendant [Central Railroad] is completed when cars are placed upon the interchange track and that defendant [Central Railroad] owes no duty to the complainant [petitioner] to receive loaded cars from it until they are put upon that track, there is no occasion to examine in detail the rates referred to."

Upon the whole case we are of opinion that no error of law was committed by the Commission in denying the petitioner's application. It follows that the motions to dismiss the petition should be granted, and it will be so ordered.