## UNITED STATES ET AL. *v.* AMERICAN SHEET & TIN PLATE CO. ET AL.

No. 734. Argued April 9, 12, 1937.—Decided May 17, 1937.

*Mr. Daniel W. Knowlton,* with whom *Solicitor General Reed, Assistant Attorney General Jackson,* and *Messrs. Elmer B. Collins* and *Edward M. Reidy* were on the brief, for the United States and Interstate Commerce Commission, appellants.

*Messrs. David A. Reed* and *John S. Burchmore,* with whom *Messrs. Arthur B. Van Buskirk, Robert L. Kirkpatrick,* and *Luther M. Walter* were on the brief, for appellees.

By leave of Court, *Messrs. Thomas P. Healy, Guernsey Orcutt, Andrew P. Martin, Marion B. Pierce, Charles R. Webber, M. Carter Hall,* and *Jervis Langdon, Jr.,* filed a brief, as *amici curiae,* on behalf of certain Railroad Companies, urging affirmance of the decree below.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

This is an appeal from decrees of a specially constituted District Court [1] of three judges enjoining and setting aside orders of the Interstate Commerce Commission

---

[1] 15 F. Supp. 711.

which required certain carriers to cease and desist from spotting cars on industrial plant tracks as part of the service rendered under interstate line-haul rates and from granting allowances out of the line-haul rates to industries doing such spotting. The appellees are five industrial concerns affected by the orders. They contend that the spotting service in question is transportation within the meaning of the Interstate Commerce Act; that the performance of the service, or the payment of an allowance to an industry which itself performs it, is sanctioned by custom and practice and by previous adjudications of the Commission; and that line-haul rates were fixed in contemplation of the rendition of such service. They further charge the orders are void because not supported by the Commission's findings or the evidence.

Upon its own motion the Commission instituted an investigation known as "Ex Parte No. 104, Practices of Carriers affecting Operating Revenues or Expenses." Part II of that proceeding had to do with terminal services.[2] Voluminous evidence was adduced largely consisting of testimony by operating officials of carriers and traffic representatives of shippers touching the service of spotting cars at points upon the systems of plant trackage maintained by large industries. The Commission's report summarized its conclusions based on the evidence as to conditions at approximately two hundred industrial plants where spotting allowances were paid by the carriers and numerous plants where such services were performed by the carrier. The Commission found that line-haul rates had not been fixed to compensate the carriers for the performance of the service in question and that the railroads, after fixing their rates, had assumed a burden not previously borne by them. It found that § 15 (13) of the Act permitting allowances by carriers to those performing a portion of the service of transportation had been made the instrument of abuse by the pay-

---

[2] 209 I. C. C. 11.

ment of unwarranted allowances and added: "When a carrier is prevented at its ordinary operating convenience from reaching points of loading or unloading within a plant, without interruption or interference by the desires of an industry or the disabilities of its plant, such as the manner in which the industrial operations are conducted, the arrangement or condition of its tracks, weighing service, or similar circumstances, . . . the service beyond the point of interruption or interference is in excess of that performed in simple switching or team-track delivery." In conclusion, the report states that payment for or exemption of the cost of service performed beyond such points of interruption or interference is in violation of § 6, provides the means by which the industry enjoys a preferential service not accorded to shippers generally, dissipates the carrier's funds and revenues, is not in conformity with the efficient or economical management contemplated by the Interstate Commerce Act and is not in the public interest. No orders were made upon the footing of the main report, but thereafter, Division 6 promulgated supplemental reports recapitulating the testimony touching particular plants and making findings with respect to each and the service rendered thereat. Upon the basis of these supplementary proceedings orders to cease and desist were entered.[3] The carriers thereupon gave notice of a revision of the applicable tariffs, cancelling allowances or withdrawing the spotting service. Each appellee filed a bill praying that the order affecting it be set aside and enforcement be restrained. The causes

---

[3] The reports and orders affecting the appellees are the following: American Sheet & Tin Plate Company Terminal Allowance, 209 I. C. C. 719; Allegheny Steel Company Terminal Allowance, 209 I. C. C. 273; Pittsburgh Plate Glass Company Terminal Allowance, 209 I. C. C. 467; Weirton Steel Company Terminal Allowance, 209 I. C. C. 445; West Leechburg Steel Company Terminal Allowance, 210 I. C. C. 213; Pittsburgh Plate Glass Company Terminal Allowance, 210 I. C. C. 527.

were consolidated for hearing and were disposed of upon a single record in one opinion. Separate decrees were entered in the respective causes granting the requested relief. The appellants took a single appeal from all the decrees. We hold the Commission's orders were lawful and should not have been set aside.

*First.* The appellees urge that the orders are fatally defective because the Commission failed to make the necessary quasi-judicial findings. They point out that the Commission held that an allowance furnished a means whereby an industry enjoyed a preferential service not accorded to shippers generally, and constituted a refund or remission of a portion of the rate for transportation in violation of § 6 (7) of the Interstate Commerce Act. They assert these conclusions are insufficient to support a cease and desist order because the Commission has not found, as it must to bottom an order on §§ 2, 3 and 15 (1) of the Act,[4] that the practice was unreasonable, unjustly preferential, unduly discriminatory, or otherwise unlawful. Respecting § 6 (7)[5] they say that as, by that section and § 15 (13),[6] allowances to shippers who perform a part of the service of transportation are permissible if tariffs setting forth the nature and amount of the allowance are duly filed, as they were in the present instance, it cannot be an unlawful refund or rebate for the carriers to make the allowances which the tariffs specify. If the findings were limited to the practices specified in the sections mentioned the position of the appellees would no doubt be sound, but the Commission has, in each case, found that the interchange tracks of the respective industries are reasonably convenient points for the receipt and delivery of interstate shipments and that the industry performs no service beyond those points of interchange

---

[4] 49 U. S. C. §§ 2, 3 (1), 15 (1).

[5] 49 U. S. C. § 6 (7).

[6] 49 U. S. C. § 15 (13).

for which the carrier is compensated under its interstate line-haul rates. These findings are an adjudication by the Commission that the spotting service within the appellees' plants is not transportation service which the carriers are bound to render in respect of receipt and delivery of freight. The statute contains this definition: "The term 'transportation' shall include . . . all services in connection with the receipt, delivery, elevation, and transfer in transit . . . of property transported." [7] The Interstate Commerce Commission is authorized and required to enforce the provisions of the Act [8] and, after hearing, if it be of opinion that any regulation or practice of a carrier be unjust or unreasonable, or unjustly discriminatory, "or otherwise in violation of the provisions of this act," to determine what practice is or will be just, fair and reasonable to be thereafter followed and to make an order that the carrier cease and desist from violation to the extent that the Commission finds violation does or will exist. [9]

*Second.* The Commission, so it is said, has approved allowances in instances such as those under review and by a long course of decision has sanctioned the practice; and the claim is that the carriers have relied upon the Commission's action in doing plant spotting or making allowance for the performance of that service by industries. We cannot agree either that the Commission has so decided or that if it had it would be concluded from re-examining the question in the light of existing conditions. The Commission has repeatedly dealt with the matter. [10] In numerous instances, upon application of

[7] Act of June 29, 1906, c. 3591, § 1, 34 Stat. 584; 49 U. S. C. § 1 (3).

[8] 49 U. S. C., § 12 (1).

[9] 49 U. S. C., § 15 (1).

[10] Associated Jobbers of Los Angeles *v.* A. T. & S. F. Ry. Co., 18 I. C. C. 310; Car Spotting Charges, 34 I. C. C. 609; National Malle-

an industry for the performance of spotting service on its plant track system, or for an allowance from the carrier for itself performing the service, the Commission, in the view that like service was performed or an allowance paid for it at other similar plants, has ordered the removal of discrimination as between shippers. On the other hand, in some cases the Commission has held that the service demanded was not a service of transportation and has refused to order the carrier to perform it.[11] But whatever may have been decided in the past, it is evident that the growth of the practice of making allowances for plant switching and the lack of uniformity in the practice of the carriers with respect to this service properly called for an investigation of the entire situation and the promulgation of appropriate orders to regulate the practice and prevent performance of a service not within the carrier's transportation obligation. The investigation and the consequent orders of the Commission were not foreclosed by its earlier decisions. The Commission is clearly empowered to determine what is embraced within the service of transportation and what lies outside that service.[12] Since the Commission finds that the carriers' service of transportation is complete upon delivery to the industries' interchange tracks, and that spotting within the plants is not included in the service for which the line-haul rates were fixed, there is power to enjoin the performance of that additional service or the making of an allowance to the industry which performs it.

---

able Castings Co. v. Pittsburgh & L. E. R. Co., 51 I. C. C. 537, and many others.

[11] General Electric Case, 14 I. C. C. 237; Crane Iron Works Case, 17 I. C. C. 514, 209 Fed. 238. Compare N. Y. C. & H. R. R. Co. v. General Electric Co., 219 N. Y. 227, 114 N. E. 115.

[12] Los Angeles Switching Case, 234 U. S. 294, 311; Merchants Warehouse Co. v. United States, 283 U. S. 501, 508.

*Third.* What has been said makes it unnecessary further to discuss the question of the adequacy of the Commission's findings. If supported, they are sufficient to sustain the orders made.

*Fourth.* The cases were heard by the District Court on the record made before the Commission. The appellees challenge the orders as without support in the evidence. Examination of the record discloses that there is substantial evidence to sustain the Commission's findings.

It is conceded that the line-haul rate covers delivery. Such rates are usually made to or from an area, sometimes designated a "switching district" or "switching limits." Within that area the carrier holds itself out as agreeing to deliver freight in its freight depot or at team tracks or on sidings or spur-tracks owned by an industry. The practice has come to be uniform that in delivering a car on a team track the carrier will spot the car at a point where merchandise of the class contained in the car is usually and most conveniently unloaded; thus there are particular team tracks or points where fruit and vegetables, furniture, etc., etc., are constantly loaded and unloaded and cars are spotted accordingly. In the analogous situation where an industry's warehouses or other facilities are located at given points on a spur or side-track, the carrier holds itself out to spot the car at the point where it is needed for loading or unloading, as a warehouse door, a scrap pile, etc., etc.

In the case of a large industry having many points of loading and unloading throughout its plant, the usual arrangement is to have lead tracks or interchange tracks on which the cars are, in the first instance, shifted; thence they are taken over plant tracks to various buildings and points and are spotted in accordance with the needs and convenience of the industry. It is asserted by the appellees that it has become customary to do this spotting

on plant tracks as part of the delivery service which the carrier holds itself out as agreeing to perform without a charge additional to the line-haul rate. The record fails to establish any such custom. Carriers in official territory have, for perhaps thirty years, made allowances to certain industries for doing spotting within their plants. No uniform rule as to when such an allowance would be made has been adopted although there have been efforts to agree upon a rule. Apparently the plants most favored have been steel plants and some carriers have refused to extend the system of allowances to other than steel plants. It appears from the record that the making of allowances has not been governed by any principle and the cases fall into three general classes: (1) Where the plant does its own spotting and receives an allowance; (2) where the railroad does plant spotting; (3) where the industry does its own spotting and receives no allowance.

No allowances have been granted in New England territory, in the Southeast, or in the extreme Southwest. The practice of granting allowances has spread, to some extent, from official territory across the Mississippi and to the Northwest but here again there is no uniform rule about the matter. There is no custom or practice which has the force of a rule of law that the line-haul rate includes plant spotting service.

The testimony of operating officials of the carriers and transportation officers of industries was not entirely consistent. Some took the position that it is the obligation of a carrier to spot a car on plant tracks if the spotting involves but a single uninterrupted movement which can be made at the carrier's convenience. Many took a broader view and indicated that in consideration of the large amount of traffic emanating from and terminating at a given plant the spotting of cars, in coöperation with the needs of the plant, would not involve a burden greater than the delivery of similar cars on team tracks.

There was much opinion evidence to the effect that the cost of spotting a car on plant tracks is no greater than that of placing a car on team tracks. There was, however, opinion evidence to the contrary, and facts were developed with respect to the amount of engine time involved in some of the operations under examination from which it may fairly be deduced that the industry switching involved greater expense than team track switching.

The Commission properly held that each case must be decided upon the circumstances disclosed. It accordingly examined the evidence respecting the operations at the plant of each of the appellees and made its findings with respect to each upon the evidence in the record. We find it unnecessary to detail that evidence since it is summarized in the Commission's reports. It is sufficient now to say that in every case the Commission found, upon sufficient evidence, that the cars were, in the first instance, placed upon lead tracks, interchange tracks or sidings and subsequently spotted from these tracks; in each instance the spotting service involved one or more operations in addition to the placing of the car on interchange tracks, such as moving it to plant scales for weighing, or some additional burden, such as conformance to the convenience of the plant, supply of special motive power required by the plant's layout or trackage or some other element which called for excessive service greater than that involved in team track spotting or spotting on an ordinary industrial siding or spur. We are unable to say that the findings in respect of the individual plants lacked support in the evidence. We are, therefore, bound to accept them and to hold the orders lawful.

The decrees will be reversed and the causes remanded for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE BUTLER is of opinion that the commission's ruling that the carriers' service of transportation is

complete upon delivery to the industries' interchange tracks is not supported by the circumstantial facts found or by the evidence; that the orders here involved are based upon a misconstruction of the Act, and that the decrees of the district court should be affirmed.