**INLAND STEEL CO. et al. v. UNITED STATES et al., and six other cases.**

Nos. 14738, 14777, 15240, 15309, 15355, 14905.

District Court, N. D. Illinois, E. D.
April 25, 1938.

292

L. M. Walter, N. D. Belnap, and J. S. Burchmore, all of Chicago, Ill., for plaintiffs.

D. W. Knowlton and Nelson Thomas, both of Washington, D. C., M. L. Igoe, U. S. Atty., of Chicago, Ill., and E. B. Collins, Asst. Atty. Gen., for the United States.

Before SPARKS, Circuit Judge, and WILKERSON and LINDLEY, District Judges.

LINDLEY, District Judge.

These six cases were consolidated for hearing, as the issue in each is substantially the same. The suits are of the precise character of those considered in United States et al. v. American Sheet & Tin Plate Co. et al., 301 U.S. 402, 57 S.Ct. 804, 81 L.Ed. 1186, wherein the court reversed an injunctional order entered at the suit of certain industrial corporations against the enforcement of an order of the Interstate Commerce Commission, which had its basis in Ex Parte No. 104 investigation of the Interstate Commerce Commission and certain supplementary proceedings as to each industry. In view of the determination in the case cited, the only question presented here is whether the specific facts existing with reference to each of the several industries here involved bring these cases within the rules announced by the Supreme Court. The findings of the Commission in the cases here involved were substantially the same as those considered by the Supreme Court. In that case the court found that there was substantial evidence to support the findings. Here the plaintiffs contend that substantial support of the Commission's findings is lacking and that the evidence is not such as to support the orders entered. Consequently it has devolved upon us to examine the evidence as to each plaintiff.

1. Inland Steel Company. From the supplementary proceedings as to the Inland Steel Company it appears that the company manufactures a general line of iron and steel products and coke by-products. Its property is in two sections, Plant No. 1 and Plant No. 2. No. 1 is bounded on the north by the New York Central Railroad and on the south by the Pennsylvania. The plants are separated by the lines of the New York Central, the Baltimore & Ohio, and the Elgin, Joliet & Eastern. Both plants have

been served since 1906 solely by the Indiana Harbor Belt from its Michigan Avenue Yards located slightly more than one mile from the steel company's property.

The inbound commodities at Plant No. 1 consist principally of coal, scrap iron, parts, oil, acid, spelter, kegs, and grease; the outbound commodities of steel bars, plates, shapes, sheets, bolts, rivets, spikes, and angles. The inbound commodities at Plant No. 2 are principally coal, scrap, and oil and the outbound commodities structural steel, rods, bars and rails, tie plates, angle bars, sulphate of ammonia, naphtha, and creosote. The company accommodates daily some 350 inbound cars and some 125 outbound cars.

Each plant is served by an extensive system of railroad tracks, there being approximately 50 miles of track within the plants. The steel company owns 22 standard-gage locomotives, 8 narrow-gage locomotives, and 499 freight cars, a number of which are of special type, built to facilitate intraplant movement of materials responsive to industrial needs. The narrow-gage equipment is used exclusively for intraplant and industrial service. Formerly the Indiana Harbor did the switching but the exigencies of the industry were such that it was deemed advisable that the steel company use its own locomotives and perform the service rather than depend upon the carrier.

The Indiana Harbor Belt delivers and receives freight on the interchange tracks located within each of the plants, sometimes as much as an entire train being placed on the interchange tracks at one time. The cars are not classified according to their contents or final destination before delivery within the plant. After delivery on the interchange tracks, classification and spotting of the cars is performed by the steel company's locomotives, for which it receives from the carriers $1.85 per loaded car. The services beyond the interchange tracks must be accommodated to the needs of the steel company; they cannot be performed in conformity with transportation operations which the railroad company can reasonably be required to perform and are in excess of team track or simple switch placement.

The respective interchange tracks are reasonably convenient points for the delivery and receipt of carload freight. The transportation service for which the carrier is compensated in its line-haul rates begins and ends at these tracks. The service performed by the Inland Steel Company beyond those points is a plant service which the carrier is not bound to perform and for which it is not compensated.

We find substantial evidence to support these findings in the record, vol. 5, pp. 4486, 4492 to 4493; vol. 4 of Exhibits, p. 293, R. 7747; vol. 7, pp. 7632 to 7659.

2. Interlake Iron Corporation. The Duluth plant of this corporation was formerly owned and operated by the Zenith Furnace Company; it was purchased by the present owner in 1930 and is now known as the Zenith division of the iron corporation. It produces pig iron, coke, and coke oven by-products and sells coal at wholesale. Its principal inbound commodities are iron ore, scrap, acid, and calcium chlorine. Its principal outbound shipments consist of coal, pig iron, coke, and its by-products and under normal business conditions average about 2,500 cars per month.

In the northern section of the plant are a pig iron storage yard, blast furnace, cast house and other necessary buildings used in producing pig iron, as well as a power plant, consisting of a large boiler house and engine room, ore storage yards and an ore-thawing plant used during the winter season and a large ore unloading and storage trestle. In the central portion of the plant is the coke and by-products plant, which consists of a large battery of ovens and numerous buildings and tanks used in the production of coke and in handling and shipping the by-products. West of the coke ovens is a storage gas container of the capacity of 1,000,000 cubic feet. East of the ovens and near the plant boundary is ground used for the storage of coke. The south portion of the plant, which adjoins the coke by-products works, contains a coal dock about 2,000 feet long, served by a boat slip. Adjoining this dock and paralleling it is a coal storage yard about 375 feet wide with a capacity of 500,000 tons.

All portions of the plant are served by industrial tracks, consisting of 10 miles of standard-gage trackage, divided into approximately 45 separate tracks, and a small amount of narrow-gage track. North of the plant is the main line of the Northern Pacific. The carrier delivers and receives cars on interchange tracks which it owns, located outside of the plant immediately adjacent to the northwest corner of the industrial property. Two track scales, owned by the corporation, are located within the

plant near the interchange yards and all cars handled at the plant are weighed empty and loaded. Between the interchange tracks and the numerous points of loading or unloading scattered throughout the plant, the cars are handled by locomotives owned by the industry, and for the switching or spotting service by the company an allowance is paid by the carrier. A considerable amount of switching service within the plant is performed by locomotive cranes.

The allowance to the Zenith Company was first made by an agreement between that company and the carrier on October 2, 1903. The agreement recited that inasmuch as the business of the furnace company had so increased that it required a large part of the time of an engine and crew to perform the handling and switching of cars and inasmuch as the iron company was willing to handle the switching upon receiving proper compensation, the carrier agreed to construct a suitable interchange track and to pay the industry $1 per loaded car for cars handled by it on which it received the line-haul revenue. In 1921 the allowance was increased to $1.50 per car, and this allowance has continued to the iron corporation since its acquisition of the plant and applies to loaded cars handled by the carrier under switching charges as well as those on which the carrier receives line-haul revenue.

The plant has been enlarged since 1903 when the allowance first became effective and it has become even more impractical than it was then to operate the carrier's locomotives therein. Under business conditions such as prevailed in 1930 the spotting of cars by the carrier at the loading or unloading points within the plant would require 2½ 8-hour locomotive tracks for each 24-hour period as well as additional yard masters, enginehouse men, yard checkers and messengers. Even then the industry would have to continue to use its locomotives and cranes for performing interplant switching.

Among the necessary plant operations during times of normal business are the selection of cars containing blast furnace materials such as ore, coke, and scrap iron and the movement of those cars in specified volumes and proper order to facilitate the production of pig iron. During the summer season, cars containing ore are handled from the interchange tracks, weighed and moved to an ore trestle, where the contents are dumped and delivered by mechanical means to the blasting furnace. In the winter season, when the ore is frozen, it is necessary to move cars into heated buildings of which there are 6, each having a capacity of 7 cars, where the ore is thawed. It is then moved for storage or to the trestle for dumping.

Much coal comes in by both the coal dock and storage yard. The extreme end of the coal dock is about 1½ miles from the interchange track. Four industrial railroad tracks, each with a capacity of about 30 cars, serve this yard. The dock, yard, and tracks are served by a traveling coal-handling bridge with traveling coal-screening plant which unloads coal from boats to the storage yard, or into cars or from the storage yard into cars. Outbound cars are loaded at any point on the track which parallel the coal yard and then moved to the scales, weighed, and from this point moved to the interchange tracks. The distance between the coal storage yard and the interchange tracks ranges from 1,600 to 3,100 feet. Other outbound commodities are moved from the coke plant or by-products plant or from the blast furnace or other loading points within the property, being weighed en route. These movements average from one-fourth to one-half mile in length.

Because of intraplant movement, performed by the iron company's locomotive cranes and switching engines, considerable interference with the industrial operation would result if the carrier attempted to perform the spotting service within the plant. The movements described, all of which take place beyond the interchange tracks, located closely adjacent to the scales and plant entrance, are clearly a part of the industrial operation and not a part of the transportation service which a carrier is obligated to perform under line-haul rates. The carrier is prevented by the manner in which the industrial operations are conducted from performing service beyond the interchange tracks.

The line-haul rates cover the delivery and receipt of shipments at a reasonable convenient point, which, in the present instance, is the interchange tracks, and the transportation service of the carrier begins and ends at these tracks. The movements by the iron corporation between the interchange tracks and points within the plant are industrial services which it is not the duty of the carrier to perform.

The evidence supports these findings and conclusions. See pages 6837 to 6879, inclusive, and Exhibit B-28.

■ 3. Crane Company. This company's property in Chicago covers approximately 150 acres of land wherein are manufactured plumbing and steam fitting supplies, pipes and valves. Eight miles of track, comprising about 40 separate tracks, are located within the plant. The industry owns one locomotive, which is used principally for intraplant switching. The various carriers deliver and receive traffic on nine interchange tracks which have a capacity of 85 cars, and service to and from these tracks is made over one lead track. The principal inbound commodities are scrap and pig iron, fluor spar and brick. Cars containing these materials, after being placed on the designated interchange tracks, are moved by the locomotive to a track scale where they are weighed, in order to afford the industry an accurate record of its stock and materials, and then to another series of tracks at another corner of the plant, during daylight hours. At night, after operation of the plant has suspended, an engine and crew of one of the carriers, referred to as the switching company, on behalf of all the carriers, performs the necessary classification and switching of the cars from the second series of tracks referred to, to numerous points of loading or unloading located in various parts of the plant. It is impractical to perform this switching during working hours, due to industrial operations and consequent hazards. The switching company's locomotives, in some instances, remove loaded cars from the point of loading to the outbound tracks, but that work is usually performed by the plant locomotive. The expense to the switching company in performing the service is prorated on an engine-hour basis among the carriers for which the service is performed. Under normal conditions the switching service performed by the switching company requires about 7 hours daily. As many as 40 loaded cars have been shipped from the plant in one day.

The service performed beyond the interchange tracks is an industrial service which the carriers are not obligated to perform and for which they are not compensated under their line-haul rates.

Substantial evidence in support of these findings and conclusions is found in the record at pages 3797 to 3827; 4497 to 4502; 8499 to 8505; 8513 to 8524; 8477 to 8498.

■ 4. American Steel Foundries. This company operates at Indiana Harbor, manufacturing steel castings and railroad specialties. The plant, consisting of buildings and material yards, is served by 2 miles of standard-gage railroad track. There are 23 separate tracks within the plant and the company maintains a locomotive primarily for moving cars in intraplant service between the various parts of the plant. The Indiana Harbor Belt Railroad delivers and receives cars on interchange tracks located on the carrier's property, paralleling one side of the plant. The Elgin, Joliet & Eastern delivers and receives cars on interchange tracks paralleling another side. Inbound traffic of from 8 to 10 cars daily consists principally of scrap and pig iron, ore, sand, coal, and clay; outbound commodities of the manufactured products. The cars containing the inbound and outbound commodities are moved by the company's locomotive between the interchange yards and the points of unloading or loading, of which there are about 30. For such service an allowance of $1.85 per loaded car has been paid by the carriers since 1921.

Formerly the interchange service was performed by the carriers. In 1916 the industry acquired its locomotive and began performing all of the switching. Approximately 50 per cent. of the locomotive time at the plant is consumed in the performance of intraplant switching and movements of this nature are not performed by the carriers except at a switching charge. It appears, therefore, that the industry was able through the operation of its own locomotive to have its intraplant switching performed at times and in a manner to suit its industrial convenience and at the same time avoid the carriers' switching charges for intraplant switching.

In performing spotting service the industry's locomotive moves the cars between the interchange tracks and the points of loading and unloading within the plant at such times and in such manner as will best facilitate the industrial operations. As many movements are made daily as the industrial operations require. Such service is industrial service not within a carrier's obligation to render for shippers. The industry, by performing the spotting service for which it is reimbursed by the carriers through payment of the allowance, has the advantage of a superior switching service as compared with industries which are provided with only the normal service rendered by carriers.

The existing line-haul rates of the carriers must be construed to cover delivery

and receipt of shipments at a reasonably convenient point. The interchange. tracks constitute such a reasonable point, and transportation service which it is the duty of the carriers to perform begins and ends at these tracks. The movements beyond those tracks constitute industrial services, which it is not the duty of the carriers to perform under the line-haul rates.

Substantial evidence supporting these findings and conclusions appears in the record, pages 7592 to 7609; 7610 to 7615; 7617; 4499 to 4507.

■ 5. Chicago By-Products Coke Company. This industry produces at its plant at Hawthorne near Chicago gas, coke, and by-products, such as sulphate of ammonia and tar. Its plant covers an area approximately 2,200 feet wide and 3,200 feet long, wherein are located a machine shop, boiler house, generator house, a by-product building, three coke oven batteries, and the facilities necessary for storing and handling large quantities of coal and coke. The buildings and facilities are served by a network of some 35 tracks extending throughout the plant and having a capacity of approximately 800 cars. Approximately 30,-000 cars are handled at the industry annually, about 60 per cent. being inbound and 40 per cent. outbound. There are two principal loading points for coke, two for tar and one each for ammonia sulphate, acid, lime, oxide and miscellaneous stores. Inbound and outbound shipments are delivered or received by carriers on 7 parallel interchange tracks, mostly within the industrial property.

The industry with its own power moves the cars between the interchange tracks and loading and unloading points located on tracks within the plant. Approximately 60 per cent. of the total engine-hour time is devoted to interchange switching and 40 per cent. to intraplant switching. The plant operates 24 hours a day and as many locomotives are kept in service as the industrial needs require. It would be impossible to operate the plant in an efficient manner if the switching were performed by railroad crews and locomotives. Plant operations are carried on in such a way that the plant locomotives, being under the industry's supervision, can perform the spotting service more efficiently and at less expense than the railroads can perform it and it is possible for the crews of the plant locomotives to perform spotting with less interference than if a carrier crew should perform it.

The loading and unloading points are within the plant. Some of them could be reached directly from the carrier tracks, but the greater part of them may.be reached only by the movements heretofore described. The spotting of cars at the track hopper is done by an electric car puller, which can handle only 1 car at a time. The industry produces a large amount of gas and must be prepared at all times to meet the demands of the public. A locomotive must be available to move cars between the interchange yards and the track hopper at such times and in such numbers as the industrial needs require.

For the spotting service thus rendered the industry receives from the carrier a maximum allowance of $1.85 per loaded car. The track layout is unusually complex as compared with ordinary team tracks or industrial tracks upon which carriers ordinarily perform switching. The amount of spotting service required by the industry and the manner in which it must be performed is in excess of that which carriers are obligated to render under their line-haul rates. Those rates must be construed to cover delivery and receipt of shipments at reasonably convenient points. The transportation service which it is the duty of the carriers to perform begins and ends at the interchange tracks and the movements beyond those tracks are industrial services.

Substantial evidence supporting these findings and conclusions appear in the record at pages 3740 to 3750; 8237 to 8268; 8275 to 8290.

■ 6. Acme Steel Company. This company's plant, located at Riverdale near Chicago, Ill., lies near the Illinois Central & Pennsylvania Railroad tracks. The Pennsylvania may handle incoming and outgoing freight directly, but the Illinois Central must use the trackage of the Pennsylvania.

The plant has been operating since 1919 and was enlarged in 1929. On it are located 11 tracks of the total mileage of 4.7 miles, serving seven loading and five unloading points where freight cars are spotted. The chief article of manufacture is strip steel and the principal commodities handled are steel, coal, and acid. Inbound and outbound shipments average 450 carloads monthly. The two carriers performed the necessary spotting service until 1925 when the steel company purchased two locomotives and elected to perform the service, provided it was paid an allowance. Since that time cars have been received and delivered by

carriers on interchange tracks located within the plant and the two plant locomotives are then used alternately in performing the spotting and intraplant switching. The company also owns and operates two locomotive cranes used principally for the unloading of cars containing coal. The carriers pay to the steel company an allowance of $1 per loaded car for this spotting service.

Certain tracks within the plant on which cars are unloaded or loaded do not have capacity to accommodate at one time cars used in the daily operations. This requires in many cases that cars on such tracks be switched as soon as they are loaded or unloaded and that other cars which have been held on the interchange or storage tracks be placed for like purposes. If the Pennsylvania were called upon to do this switching, the assignment of an additional locomotive would be necessary, due to the services required in the now enlarged plant. Some of the outbound cars are loaded with different kinds of steel produced at different points, and this fact necessitates movement of such cars to and from those units for partial loading.

It appears clearly that the services rendered beyond the interchange cars is necessitated by the industrial requirements and is in excess of the carrier's obligation under its direct line-haul rates. The existing rates of the carriers must be construed to cover the delivery and receipt of shipments at a reasonably convenient point. The interchange tracks constitute such a reasonable point. The transportation services which it is the duty of the carriers to perform begin and end at the interchange tracks, and the movement required by the steel company between these tracks and points of loading and unloading are industrial services which it is not the duty of the carriers to perform.

Pertinent evidence in the record, at pages 3740–3761; 7524–7531; 7577–7592; 7578–7592, gives substantial support to these findings and conclusions.

The facts in each of these cases are such that the decision of the issues involved is controlled by United States v. American Sheet & Tin Plate Co., 301 U.S. 402, 57 S. Ct. 804, 81 L.Ed. 1186. There the court said (page 809): "The Commission properly held that each case must be decided upon the circumstances disclosed. It accordingly examined the evidence respecting the operations at the plant of each of the appellees and made its findings with respect to each upon the evidence in the record. We find it unnecessary to detail that evidence since it is summarized in the Commission's reports. It is sufficient now to say that in every case the Commission found, upon sufficient evidence, that the cars were, in the first instance, placed upon lead tracks, interchange tracks or sidings and subsequently spotted from these tracks; in each instance the spotting service involved one or more operations in addition to the placing of the car on interchange tracks, such as moving it to plant scales for weighing, or some additional burden, such as conformance to the convenience of the plant, supply of special motive power required by the plant's layout or trackage or some other element which called for excessive service greater than that involved in team track spotting or spotting on an ordinary industrial siding or spur. We are unable to say that the findings in respect of the individual plants lacked support in the evidence. We are, therefore, bound to accept them and to hold the orders lawful."

The court further said: "The Commission is clearly empowered to determine what is embraced within the service of transportation and what lies outside that service. Since the Commission finds that the carriers' service of transportation is complete upon delivery to the industries' interchange tracks, and that spotting within the plants is not included in the service for which the line-haul rates were fixed, there is power to enjoin the performance of that additional service or the making of an allowance to the industry which performs it. * * * The Commission has, in each case, found that the interchange tracks of the respective industries are reasonably convenient points for the receipt and delivery of interstate shipments and that the industry performs no service beyond those points of interchange for which the carrier is compensated under its interstate line-haul rates. These findings are an adjudication by the Commission that the spotting service within the appellees' plants is not transportation service which the carriers are bound to render in respect of receipt and delivery of freight. The statute contains this definition: 'The term "transportation" * * * shall include * * * all services in connection with the receipt, delivery, elevation, and transfer in transit * * * of property transported.' The Interstate Commerce Commission is authorized and required to enforce the provisions of the act and, after

298

hearing, if it be of opinion that any regulation or practice of a carrier be unjust or unreasonable, or unjustly discriminatory, 'or otherwise in violation of any of the provisions of this act [chapter],' to determine what practice is or will be just, fair and reasonable to be thereafter followed and to make an order that the carrier cease and desist from violation to the extent that the Commission finds violation does or will exist."

All this language applies with full force and effect to each of the cases here.

We are unable to say that the findings in respect to the several industrial plants lacked support in the evidence. Rather we find substantial support for each. We are, therefore, bound to accept them and to hold the orders valid.

We find nothing in the record distinguishing these cases from those considered by the Supreme Court.

Accordingly the temporary injunctions heretofore entered will be dissolved and each of the bills dismissed for want of equity at the cost of plaintiffs.

The foregoing includes and is adopted by us as our findings of fact and conclusions of law.