**WABASH R. CO. et al. v. UNITED STATES et al.**

Civ. A. No. 243.

District Court, S. D. Illinois, S. D.
June 10, 1943.

Allen Crenshaw, Interstate Commerce Commission, of Washington, D. C., and Edward Dumbauld, Sp. Asst. to Atty. Gen., for United States and Interstate Commerce Commission.

Elmer A. Smith, of Chicago, Ill., Richard F. Butler, N. S. Brown, of St. Louis, Mo., and William B. Browder, of Chicago, Ill., for plaintiffs.

LeForgee, Samuels & Miller, of Decatur, Ill., and Walter, Burchmore & Belnap, of Chicago, Ill., for A. E. Staley Mfg. Co.

Before EVANS, Circuit Judge, and LINDLEY and BRIGGLE, District Judges.

BRIGGLE, District Judge.

This is a proceeding to set aside the order of the Interstate Commerce Commission, entered May 6, 1941, entitled Ex Parte No. 104, Practices of Carrier Affecting Operating Revenues or Expenses; Part II, Terminal Services (Report on Further Hearing of Issues Included in the 55th Supplemental Report), 245 I.C.C. 383, which report and order may be said to be supplementary to 209 I.C.C. 11. The plain-

tiffs are common carriers whose lines of railroad traverse and serve the city of Decatur and the surrounding area in the Southern District of Illinois. The intervener, A. E. Staley Manufacturing Company, is engaged in the processing of grain including corn and soy beans and the manufacture of various products therefrom at Decatur, Illinois. It receives annually by rail at its plant large quantities of grain, soy beans, and raw materials of all kinds and ships by rail from its plant large quantities of manufactured products.

The history of the proceeding is long. Briefly stated, it arose in 1931, when the Commission upon its own motion instituted a proceeding entitled "Ex Parte 104" which was an investigation of practices of Class 1 Rail Carriers in respect to terminal switching charges and allowances paid by carriers where industries performed their intraplant switching or spotting services. Hearings were held throughout the country in which many industries and carriers participated and a large volume of evidence was taken. On May 14, 1935, the commission made its report, 209 I.C.C. 11, in which it stated its general conclusions as to the obligations of line haul carriers to render spotting service and the principles governing such obligations. Subsequent thereto the Commission made numerous supplemental reports, undertaking to apply the principles there enunciated to specific plants and industries, some of which have been before and have been approved by the Supreme Court, notably United States v. American Sheet & Tin Plate Co., 301 U.S. 402, 57 S.Ct. 804, 81 L.Ed. 1186; Goodman Lumber Co. v. United States, 301 U.S. 669, 57 S.Ct. 936, 81 L.Ed. 1333; A. O. Smith Corporation v. United States, 301 U.S. 669, 57 S.Ct. 936, 81 L.Ed. 1333; United States v. Pan American Petroleum Corp., 304 U.S. 156, 58 S.Ct. 771, 82 L. Ed. 1262. The 55th of these Supplemental Reports, made on May 22, 1936, concerned spotting service at the plant of the intervener, A. E. Staley Manufacturing Company. In this report the Commission found that the intraplant spotting of cars then performed by the Staley Company, for which the railroads paid Staley an allowance, was a private service not within the obligations of the carriers and covered by their line haul rate and that the assumption of such obligation by the carriers was a violation of Section 6(7) of the Interstate Commerce Act, 49 U.S.C.A. § 6(7). The Commission made an order requiring the carriers to cease and desist from the payment of such allowances.

Subsequently, the Staley Company ceased performing such spotting service and arranged with the carrier to do the same and a charge of $2.50 per car was established for such service, in addition to the line haul rates. Later the plaintiff carriers by schedules effective December 15, 1939, proposed to cancel such charge for spotting services in the Staley plant but the Commission by their order of May 6, 1941, suspended the operation of such proposed schedule, leaving the spotting charge against Staley in full force and effect. Neither plaintiffs nor intervener challenges in this proceeding the validity of prior orders entered in Ex Parte 104, but the principal point of contention arises from the assertion of the plaintiffs and the intervener and denial by defendants that by the order of May 6, 1941, the Staley Company is unduly prejudiced by reason of the fact that competing industries at Decatur, Illinois, and other places within the state are receiving spotting services from the carriers without charge. The carriers and Staley assert that the order exacting a charge from Staley amounts to a continuing discrimination against Staley.

The Commission made six findings of fact and six conclusions of law. Finding of fact 5 is, as follows: "5. All services between the tracks described in the immediately preceding finding and points of loading and unloading within the plant area of the Staley Company are services in excess of those rendered shippers generally in the receipt and delivery of traffic on team tracks or industrial sidings and spurs."

Conclusion of law 3 is, as follows: "3. That the performance by respondents, without charge in addition to the line-haul rates and charges, of service (a) from Burwell yard tracks to points of unloading within the plant area of the Staley Company (b) from points of loading within said plant area to Burwell yard tracks on loaded cars moved to that yard, and (c) from points of loading within said plant area to Wabash storage or general yard tracks on loaded cars that do not move to the Burwell yard, would result in the Staley Company receiving a preferential service not accorded to shippers generally and would result in the refunding or remitting of a portion of the rates and

charges collected or received as compensation for the transportation of property in violation of section 6(7) of the act."

Among other contentions, it is claimed by plaintiffs and intervener that finding 5 is unsupported by the evidence or by the finding of any basic facts to support it, and that Conclusion 3 is, therefore, unwarranted.

At the hearing before the Commission much evidence was introduced on this point to show that spotting service was being rendered by the carriers without charge other than the line-haul tariffs to numerous industries at Decatur and throughout Illinois and particularly to those engaged in direct competition with Staley. We think it fair to say that the evidence in the record is uncontradicted that Staley is the only concern at Decatur or within a reasonable radius thereof that is now being required to pay a spotting charge. At Decatur, Illinois, the Archer-Daniels-Midland Company, Decatur Soya Bean Products Company, and Spencer Kellogg & Sons, all of whom are in direct competition with Staley, are without exception receiving spotting service under conditions comparable to those existing at the Staley plant. The Corn Products Refining Company at Argo, Illinois, shown by the evidence to be one of the largest producers of corn products in the country, with some eighteen or twenty miles of track within its plant and with at least twenty points of loading and unloading within the plant, has always received spotting service. This plant is one of Staley's chief competitors. The plaintiffs, Illinois Central Railroad Company and Illinois Terminal Railroad Company, make no spotting charge for the delivery or receipt of freight upon their entire systems with the single exception of the Staley plant. The plaintiff, Wabash Railroad Company, was obliged to except the Staley plant from the operation of their general rule that no charges be made for spotting cars. Witnesses appeared from numerous competitors of Staley, such as American Maize Products Company, Penick & Ford, Limited, Hubinger Company, Union Starch & Refining Company, and Allied Mills, all asserting that they knew of no industry required to pay a spotting charge similar to Staley.

■ The Commission brushed aside this feature of the case with the following statement in its report: "Considerable evidence was introduced showing that spotting is performed without charge in addition to the line-haul rates at various plants, some of which compete with the plant of the Staley Company. The evidence does not satisfactorily show that the circumstances and conditions under which the spotting is performed at such plants are substantially similar to those at the Staley plant. If it did, it would only show the probability of the existence of unlawful practices at such plants and the need for investigation in connection therewith."

While the Commission says that the evidence does not satisfactorily show that the conditions at other plants are substantially similar to those at the Staley plant, yet the only evidence in the record on this subject very strongly tends to show similarity. By its further statement that if it did it would only demonstrate the need for investigations at other plants, it appears that the Commission was of the belief that each case must stand on its own bottom and be considered by the Commission independent of any other and without relation to the palpable inequities bound to flow from an order not applicable to all similarly situated. We think this too narrow a view. It is suggested that it is no defense for one charged with an offense to retort that others are guilty of like offenses. However sound this doctrine may be in relation to criminal proceedings it does not seem to be quite appropriate to the situation here presented. Where one industry of many in a highly competitive field is singled out and subjected to a tariff not imposed on any other and under compulsion of the order of the Commission obliged to pay such tariff for a number of years without relief and without action to establish like tariffs for competing industries, the order becomes an instrument of destruction. Such treatment long continued could only mean extinction of the industry thus affected. So surely as "the power to tax is the power to destroy," so is the power of rate regulation when applied inequitably.

■■ We think the finding of the Commission that the practice of furnishing spotting service to Staley by the carriers would accord Staley more favorable treatment than others, not supported by the evidence. The substantial evidence indicates quite the contrary. It indicates that under the present order Staley is being discriminated against. It thwarts the real purpose of the Commission to remove dis-

crimination in certain instances where carriers may have accorded a preferential service to one customer over another. The order here obliges the carriers to discriminate against Staley, and, as they assert, against their will, and in violation of Sections 2 and 3 of the Act, 49 U.S.C.A. §§ 2, 3.

We think that United States v. American Sheet & Tin Plate Co., supra, is not to be deemed authority contrary to the view here expressed. While it is true that the Supreme Court there said in affirming the order of the Commission that the Commission had properly held that each case must be decided upon the circumstances disclosed, yet the question of discrimination here presented was not before the court. In that case and in United States v. Pan American Petroleum Corp., supra, the court was dealing with a number of like orders in relation to a group of competing industries and no question of one industry having received different treatment from all others was before the court.

■■ To give full meaning to the Act and to translate the intention of Congress into equitable application requires a consideration of the Act as a whole. We know from Section 2 and 3 [1] that it was the express purpose of Congress to require carriers to accord equal and just treatment to all shippers. The evil to be corrected in this respect was the tendency of carriers in some instances to accord some shippers more favorable treatment than others. It was expressly declared a vicious practice to give one shipper a preference or advantage over another, or conversely, to subject any shipper to any undue or unreasonable prejudice or disadvantage. It cannot be gainsaid that that is precisely what the carriers are being forced to do in the case at bar under compulsion of the order in question. The Commission in its purpose to do justice to the carriers has inadvertently brought about such flagrant injustice to the intervening shipper as to shock the conscience of a court of equity. So far as we know, this precise question has never been before any court, but with a firm belief in the doctrine that no wrong shall exist without a remedy it seems to us that the Commission must meet the problem head on and devise some overall method of dealing with competitive industries that will eliminate the injustice here so apparent. Otherwise, the purpose of the Act will be thwarted and the resultant inequities will outweigh the evils sought to be corrected. See United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 55 S.Ct. 462,.79 L.Ed. 1023.

We think the order in question discriminatory, unjust and unreasonable, and in so far as finding 5 and conclusion 3 are concerned not supported by the evidence The prayer for injunction is allowed.

■ Intervener's request for accounting and reimbursement is a question for the Commission.

EVANS, Circuit Judge, dissents.

---

[1] "§ 2. Special rates and rebates prohibited. If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property or the transmission of intelligence, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation or transmission of a like kind of traffic or message under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful.

"§ 3. Preferences; interchange of traffic; terminal facilities.—(1) Undue preferences or prejudices prohibited. It shall be unlawful for any common carrier subject to the provisions of this chapter to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."