SWIFT & CO. ET AL. *v.* UNITED STATES ET AL.

No. 595.   Argued March 6, 9, 1942.—Decided May 4, 1942.

*Mr. Ross Dean Rynder,* with whom *Mr. Edgar B. Kix-miller* was on the brief, for Swift & Co. et al.; and *Mr. Paul E. Blanchard,* with whom *Messrs. Chas. J. Faulkner, Jr.* and *John Potts Barnes* were on the brief, for Armour & Co., appellants.

*Mr. Hugh B. Cox,* with whom *Solicitor General Fahy, Assistant Attorney General Arnold,* and *Messrs. James C. Wilson, Smith R. Brittingham, Jr., Robert L. Pierce, Daniel W. Knowlton,* and *E. M. Reidy* were on the brief, for the United States et al.; and *Mr. Douglas F. Smith,* with whom *Mr. Kenneth F. Burgess* was on the brief, for the Alton Railroad Co. et al., appellees.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Swift & Company and Omaha Packing Company, its wholly-owned subsidiary, filed with the Interstate Commerce Commission a complaint against the common carriers by railroad which served the Chicago Union Stock Yards, operated by the Union Stock Yard & Transit Company.[1] They were later joined by Armour & Com-

---

[1] Other phases of the general problem of the present case have been considered in *Adams* v. *Mills,* 286 U. S. 397; *Atchison, T. &*

pany, as intervenor, to constitute the interest referred to herein as the packers. Although Armour sought no relief, it was allowed to intervene because it was at the time litigating in the courts a similar complaint, which was later passed on by this Court in *Armour & Co.* v. *Alton R. Co.*, 312 U. S. 195. The complaint in this case concerned practices of the Union Stock Yard & Transit Company and charges collected by it from the packers, but the Yard Company was not a party to the proceedings. The packers sought a revision of the Yard Company's practices, which they said were part of the carrier-shipper relation, through the exercise of the Interstate Commerce Commission's jurisdiction over the railroads and over transportation.

The complaint charged that the packers shipped over lines of defendant carriers from various points of origin throughout the United States to Chicago, Illinois, what are known as "direct shipments" of livestock. "Direct shipments" refers to livestock consigned directly to a packer at the Union Stock Yards, as distinguished from a shipment consigned to a commission merchant at the Stock Yards for sale.[2] Direct shipments are generally of livestock which has been purchased by the packer or its buyers at country points or at markets other than

---

*S. F. Ry. Co.* v. *United States*, 295 U. S. 193; *Union Stock Yard Co.* v. *United States*, 308 U. S. 213; *Armour & Co.* v. *Alton R. Co.*, 312 U. S. 195.

[2] The Commission found, from an analysis of the billing of 3,061 cars unloaded at the Union Stock Yards from January 1935 to March 1938, that 84.4% were consigned to the Stock Yards, and the remaining 15.6% were delivered to the Stock Yards although delivery at that point was not specified in the livestock contracts. "Under the terms of the contract, complainant could have required delivery of the 15.6 percent of shipments either at the stockyards or on defendants' team tracks, but complainant never requested delivery of those shipments to any point other than the Union Stock Yards." 238 I. C. C. 179, 189. They were therefore included in "direct shipments."

Chicago. On arrival, the cars containing the livestock are placed at unloading or chute pens of the Yard Company by the railroad employees, and the stock is then unloaded and placed in the pens by employees of the Yard Company. For this unloading service, the Yard Company is paid at published tariff rates [3] by the railroads, which absorb the charge out of their line-haul rates.

The packers desire immediately to take their consignments from these unloading pens and insist that they desire no further services, and, of course, desire to incur no further charges.

The Yard Company, however, under tariffs filed with the Secretary of Agriculture pursuant to the Packers and Stockyards Act,[4] imposes upon the packers a schedule of charges known as yardage charges, which vary from ten cents to forty-five cents per head of stock. The packers say that they desire none of the services, such as weighing, watering, feeding, or holding, which yardage charges compensate, and desire only to move their stock immediately from the unloading pens to the public streets, without payment of the yardage charges. Contending that it is their legal right so to obtain delivery, the packers made sufficient demand upon the Yard Company and upon the railroad companies for immediate and free delivery of their stock from the unloading pens. This was refused, and yardage charges have been paid to the Yard Company under protest. The packers demanded from the Commission relief by way of reparation, and asked the Commission to establish rules and practices under which they may obtain delivery to themselves by the railroads of

[3] Under tariffs filed with the Interstate Commerce Commission by the Yard Company, the railroads pay to the Yard Company $1.25 per single-deck car and $1.50 per double-deck car, for services rendered as their agent in unloading the stock.

[4] Act of August 15, 1921, 42 Stat. 159, 7 U. S. C. § 181 *et seq.*

direct shipments at the Union Stock Yards in convenient, safe, and suitable pens, with egress for the immediate removal of the livestock to the nearest public street, by a way to be designated by the railroads, without the payment of any yardage charges to the Union Stock Yards & Transit Company, and without the payment of any charges other than the line-haul transportation charges of the railroads.

The Commission, after hearings, denied the packers relief, for reasons later to be considered. It found that the delivery of stock consigned by the packers to themselves at the Stock Yards, into the Yard Company's pens without affording free egress for the shipments, is not an unreasonable practice on the part of the carriers, and that the yardage charges thereafter assessed by the Union Stockyards & Transit Company are not subject to the Commission's jurisdiction. 238 I. C. C. 179.

Appellants Swift and Omaha then brought suit in a District Court of three judges for a decree permanently suspending and annulling the order of the Commission and for a remand of the complaint for decision in accordance with principles of law to be determined by the court. Appellant Armour intervened, and participated in the trial. The railroads which had been named as defendants before the Commission also intervened, as defendants in the District Court. After hearing, the District Court held, without opinion, that the Commission's findings were properly supported by evidence; that the findings made by the Commission were adequate to support its conclusion; that the practices complained of were not unreasonable; and that the Commission did not have jurisdiction of the yardage charges. It dismissed the packers' complaint, and appeal was taken to this Court.[5]

---

[5] §§ 210 and 238 (4) of the Judicial Code as amended by the Act of February 13, 1925, 43 Stat. 936, 938, 28 U. S. C. §§ 47a, 345.

The many assignments of error may be grouped under three inquiries: (1) Do the packers have an absolute right, as a matter of law, to take their direct shipments of livestock from the unloading pens free from yardage charges? (2) If there is no such absolute right, was the Commission in error in considering the history of dealings between packers and the Yard Company, together with other facts bearing on the reasonableness of the carriers' method of delivery at the Stock Yards? (3) If the practice as to delivery was correctly held a reasonable method of terminating the carriers' obligation to furnish transportation, did the Commission have jurisdiction in a proceeding against the railroad companies to inquire into or prescribe the yardage charges complained of?

## I

The packers' contention that they are entitled as a matter of absolute right to delivery of their livestock from the unloading pens without payment of yardage charges, is based upon the decision of this Court in *Covington Stock-Yards Co.* v. *Keith,* 139 U. S. 128, and the subsequently enacted § 1 (3) of the Interstate Commerce Act.

In the *Covington* case, decided on facts antedating the Interstate Commerce Act, this Court said that "A carrier of live stock has no more right to make a special charge for merely receiving or merely delivering such stock, in and through stock yards provided by itself, in order that it may properly receive and load, or unload and deliver, such stock, than a carrier of passengers may make a special charge for the use of its passenger depot by passengers when proceeding to or coming from its trains, or than a carrier may charge the shipper for the use of its general freight depot in merely delivering his goods for shipment, or the consignee of such goods for its use in merely receiving them there within a reasonable time after they are unloaded from the cars. If the carrier may not make

such special charges in respect to stock yards which itself owns, maintains or controls, it cannot invest another corporation or company with authority to impose burdens of that kind upon shippers and consignees. The transportation of live stock begins with their delivery to the carrier to be loaded upon its cars, and ends only after the stock is unloaded and delivered, or offered to be delivered, to the consignee, if to be found, at such place as admits of their being safely taken into possession." 139 U. S. at 135–136.

After the decision in this case, there was enacted § 1 (3) of the Interstate Commerce Act, providing that "The term 'transportation' as used in this chapter shall include . . . all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof and all services in connection with the receipt, delivery, elevation, and transfer in transit, . . . storage, and handling of property transported . . ." 36 Stat. 539, 545, 49 U. S. C. § 1 (3) (a).

After the enactment of § 1 (3), this Court decided *Adams* v. *Mills*, 286 U. S. 397, which arose before the enactment of § 15 (5), set forth below. The propriety of an additional charge for the unloading of livestock at the Chicago Union Stock Yards was in issue, and it was said: "That the yards are, in effect, terminals of the railroads is clear. They are in fact used as terminals; and necessarily so. Whether the unloading in the yards was a part of transportation was not a pure question of law to be determined by merely reading the tariffs. Compare *Great Northern Ry. Co.* v. *Merchants Elevator Co.*, 259 U. S. 285, 294. The decision of the question was dependent upon the determination of certain facts, including the history of the Stock Yards and their relation to the line-haul carriers; the history of the unloading charge at these yards; and

the action of the parties in relation thereto. If there was evidence to sustain the Commission's findings on these matters, its conclusion that the collection of the extra charge from the shippers was an unreasonable and unlawful practice must be sustained. *Atchison, T. & S. F. Ry. Co.* v. *United States,* 232 U. S. 199, 221; *Los Angeles Switching Case,* 234 U. S. 294, 310, 311." *Id.* at 409–410.

On February 28, 1920, prior to this decision and during the pendency of the controversy which led to it, there was enacted § 15 (5) of the Interstate Commerce Act, which provided that: "Transportation wholly by railroad of ordinary livestock in car-load lots destined to or received at public stockyards shall include all necessary service of unloading and reloading en route, delivery at public stockyards of inbound shipments into suitable pens, and receipt and loading at such yards of outbound shipments, without extra charge therefor to the shipper, consignee or owner, except in cases where the unloading or reloading en route is at the request of the shipper, consignee or owner, or to try an intermediate market, or to comply with quarantine regulations. The Commission may prescribe or approve just and reasonable rules governing each of such excepted services. Nothing in this paragraph shall be construed to affect the duties and liabilities of the carriers now existing on February 28, 1920, by virtue of law respecting the transportation of other than ordinary livestock, or the duty of performing service as to shipments other than those to or from public stockyards." 41 Stat. 456, 486, 49 U. S. C. § 15 (5).

In the subsequent case of *Atchison, T. & S. F. Ry. Co.* v. *United States,* 295 U. S. 193, it was pointed out that, in appropriate circumstances, the Commission might properly find that the carriers' duty to deliver livestock ended with delivery into suitable pens at the Chicago Union

Stock Yards, and it was recognized that the question of where the carrier's obligation ends is for the administrative judgment of the Interstate Commerce Commission.

Our most recent decision bearing on the Commission's power to determine when transportation ends, with reference to shipments of livestock to the Chicago Union Stock Yards, is *Armour & Co.* v. *Alton R. Co.*, 312 U. S. 195, rendered in the controversy over the propriety of yardage charges made in circumstances precisely similar to those of the present case, by virtue of which Armour & Co. intervened in the present litigation. There it was held by a unanimous Court that Armour's complaint in the federal District Court should be dismissed, since primary jurisdiction was lodged in the Interstate Commerce Commission; and it was said that the facts alleged in the complaint revealed that "there are many questions relating to complex transportation problems that must be solved as a prerequisite to a determination of whether the railroads, in violation of contracts or governing laws, have failed properly to deliver petitioner's livestock." *Id.* at 200. By way of illustration, the opinion detailed several questions which would arise, and among them was the following: "At what point did the common carriers' duty to transport come to an end? Neither the statute nor any applicable principle of governing law can be said to mark this boundary, under all circumstances and conditions and in all cases." *Ibid.* The decision agreed with the view of the railroads and courts below that "adjudication of the issues presented relates to such complex transportation problems that determination of the legal questions must necessarily be preceded by the consideration of extensive evidence in a specialized field, and that decision of such questions is by statute vested exclusively in the Interstate Commerce Commission." *Id.* at 197. Finally, it was said that "If use of the terminal facilities for egress to the street after unloading of livestock is a

part of transportation, as petitioner alleges, and if this use is a service for which reasonable compensation is justified, it cannot be doubted that this charge, like the unloading charge, is a part of that reasonable transportation rate determination of which is committed to the jurisdiction of the Interstate Commerce Commission. And before such long-standing transportation customs can be held illegal, it is of course necessary that evidence be heard." *Id.* at 200–201.

Thus it is seen that, before the enactment of § 15 (5), whether transportation included unloading was a question of fact for the determination of the Commission. *Adams* v. *Mills, supra.* Section 15 (5) changed this, but it did not alter the situation with respect to yardage services, *Atchison, T. & S. F. Ry. Co.* v. *United States,* 295 U. S. 193; and whether they are included in transportation is therefore a question to be decided by the Commission upon the facts of each particular case, and not by mechanical application of a fixed rule of law as contended by the appellants. *Atchison, T. & S. F. Ry. Co.* v. *United States,* 295 U. S. 193; *Armour & Co.* v. *Alton R. Co., supra.* Otherwise, we erred in requiring "primary resort" to the Commission in the *Armour* case with respect to the question where transportation ended. *Great Northern Ry. Co.* v. *Merchants Elevator Co.,* 259 U. S. 285. The propriety of the yardage charges in the present case was a question for decision by the Commission in the exercise of its judgment, and not for decision according to any fixed rule of law.

## II

In determining whether the Yard Company's unloading pens were suitable points at which to terminate the duties of carriers to consignees, and points where the consignees entered into a relationship with someone other than the carriers, the Commission was justified in considering, as it did, all that would account for the evolution

of the practice complained of, as well as the effect of existing and proposed practices on the interest of the carriers, the public, and other shippers. *Adams* v. *Mills, supra,* at 409 *et seq.; Atchison, T. & S. F. Ry. Co.* v. *United States,* 295 U. S. at 198 *et seq.; Armour & Co.* v. *Alton R. Co., supra,* at 201. Neither the railroads nor the Stock Yards exist for the benefit of the packers alone. Their patronage is large and important, but neither in the regulation of the carriers nor in the regulation of the Stock Yards are they entitled to facilities or treatment that will ignore the existence of other interests. The Stock Yards are not only a facility for the transportation of direct shipments from points of country origin to the packers; they also are an important factor in the entire animal industry of the United States. The Commission found that the direct shipments of livestock transported by rail to the packers at Chicago have exceeded 30,000 carloads annually for several years, but that the total annual average rail movement to the Stock Yards was 94,629 carloads.

The bulk of the movement of stock is received in the Yards during the first days of the week, and approximately three-fourths of the daily movement is unloaded between three and eight in the morning. In some instances, immediate removal of the animals from the unloading pens is necessary to preserve an even flow of livestock from the cars into the Yards. Apart from the direct shipments, much of this stock must be watered, fed, and weighed in the Yards. It is removed to holding pens, and one of the important functions of the Stock Yards is to furnish the facilities for marketing. Commission brokers or market agencies receive consignments of livestock and sell them for the account of the producer, sometimes to the packers and sometimes to purchasers who require re-shipment.

Shipments must be moved with great rapidity and order, and it may be that this can best be done by employees

under a single management and discipline. The customary handling over many years led to the building up of a physical plant which the Commission finds makes it physically impossible to remove this stock from the unloading pens except by use of the property of the Yard Company.

The interests of the public and of the community are entitled to consideration. This transportation is of a special kind of property on the hoof, which calls for special handling in the interests of economy, safety, sanitation, and health. The Commission has found that "the evidence fails to disclose how, as a practical matter, an annual volume of 30,000 carloads of livestock could be discharged into and handled through the public streets of Chicago." [6]

The existence and suitability of alternative facilities for delivery of livestock were considered by the Commission. Some stock is and can be delivered at team tracks and some at industrial sidings. These facilities are inadequate for handling the entire volume of direct shipments. It does not appear, however, that the existence or adequacy of alternative facilities for delivery at other points is particularly important in the case, because the shipments involved are consigned to the packers at the Union Stock Yards by their own choice. It does not appear that they are demanding an increase of other facilities, and the case has not been considered in that light.

The packers object to consideration of their own part in evolving the situation of which they complain. The Commission, however, considered it and made findings as to the history of the relation between the Yard Company and the packers.

The Commission found that, since the Yard Company began operation in 1865, there has been a line of demarkation between the services which shippers were

[6] 238 I. C. C. 179, 194.

entitled to receive for the transportation charges and the services received from the Yard Company. The line-haul carriers have paid the Yard Company for the unloading service and absorbed the charge made for such service out of their line-haul rates. From the beginning, however, all shippers were required to pay to the Yard Company a yardage charge on every animal unloaded. Dealings with respect to those charges were between the Yard Company and the shippers, with no intervention by the carriers. After these practices had been in effect for about twenty-five years, the Yard Company entered into certain arrangements under which these packers participated in the profits from its operations. Some time before 1890, the packers threatened to move their plants from Chicago and to establish facilities of their own for the receipt of their livestock. The packers had acquired a large tract of land in Indiana as a site for their proposed plants. They had also purchased property known as the "Central Stock Yards" near the Union Stock Yards and had erected thereon platforms, pens, sheds, and sidings for the purpose of receiving all cattle and livestock consigned to them. They had also filed a complaint in an Illinois court demanding that the Yard Company be required to permit the line-haul carriers to use its tracks in making deliveries to the packers' Central Stock Yards.

Having put themselves in this independent position and threatened to reduce the revenues of the Yard Company, the packers negotiated a contract which, in substance, involved the abandonment by the packing companies of this threatened move to Indiana and surrender of their own facilities for receiving direct shipments in return for a participation in the profits and capital of the Yard Company. In 1892, the packers conveyed to Stock Yard interests the Indiana site and the Central Stock Yards, and agreed by contract to dismiss the suit filed

in the Illinois court and to refrain from filing any similar suit for a period of fifteen years; to continue their business at Packingtown, adjacent to the Union Stock Yards, for fifteen years from July 1, 1891; to have all livestock slaughtered by them on their premises or within two hundred miles of the City of Chicago, during such period, pass through and use the Union Stock Yards, and to pay the usual yardage charge therefor; and they guaranteed that the Yard Company would receive and collect from its yardage charges on packers' livestock the aggregate sum of $2,000,000 within six years, and agreed to make up any deficiency in that amount. The packers also agreed that, as long as the Yard Company conducted its business in Chicago, they would not interest themselves in any other stockyards in Chicago for the receipt and use of their own livestock.

The packers received income bonds of a new corporation, the security of which was the revenues of the Stock Yards, in the amount of $3,000,000. Swift received approximately one-third. These bonds were subsequently redeemed by the issuing corporation.

The railroad companies were not parties to this agreement, and the Commission found that the packers, at the time the agreement was entered into, did not consider the assessment of the yardage charges to be a matter of any concern to the railroads. During the existence of the agreement described, the packers paid the yardage charges, and participated in the receipts from such charges. This agreement expired in 1907, except for the covenant by the packers not to establish or become interested in any other stockyards for the receipt of their livestock so long as the Yard Company maintained its business in Chicago. It appears, however, that after the expiration of the contract the Yard interests were informed that the packers were still threatening to move their plant from Chicago, and it appears that Swift expected to receive a share of

230

the Yard's earnings as late as 1918, but there is no proof that it did receive anything in addition to the bonds received under the contract of 1892. J. O. Armour, of Armour & Company, however, received substantial benefits after 1907.

Thus, for more than seventy years the responsibility of the railroads in respect of direct shipments consigned to the packers has ended with the unloading service. The packers, from that point on, have negotiated their own arrangement with the Yard Company. More recently, of course, the Stock Yards have passed under public regulation, and discrimination or rebating of the kind once practiced is no longer possible. The Commission finds that it was the attitude of the packers that their patronage was a thing of value to the Stock Yards, and they proposed to sell that patronage to the Yard Company. The Packers and Stockyards Act having made private arrangements of this kind unlawful,[7] the packers now contend that the carriers must protect them against yardage charges on their direct shipments.

It was the packers themselves who suppressed the competitive yards and alternative facilities for unloading their stock. The Commission, however, has not held the packers to be estopped by their conduct. It has only considered the practice and usage of the packers as bearing on the suitability of the Yard Company's unloading pens as a point of termination of the carriers' responsibility. The Commission has held it to be a reasonable practice that the railroads' responsibility for transportation of such direct shipment consigned by the packers to themselves at the Union Stock Yards ends with unloading into the unloading pens, which it found to be suitable, and that the carriers' failure to negotiate or purchase free egress for such shipments from the unloading pens has

[7] 42 Stat. 161, 7 U. S. C. § 192.

not resulted and does not result in an unreasonable practice. There is evidence to support the determination, and the decision of the administrative body charged with making it is therefore conclusive on this Court.[8]

### III

Having properly decided that transportation ended when the livestock reached the unloading pens, was the Commission in error in concluding that it had no jurisdiction to inquire into the reasonableness of practices or charges of the Yard Company beyond that point?

The appellants contend that the fact that property of the Yard Company was involved in furnishing egress to the appellants' shipments did not prevent the Commission from exercising such jurisdiction. The Yard Company, they say, was the agent of the railroads and acted in a dual capacity, as public stockyards subject to the Packers and Stockyards Act and also as a common carrier by railroad subject to the Interstate Commerce Act. In the latter capacity, it is said, the Yard Company, as the railroads' agent, provides terminal facilities for livestock delivery, which is a part of the railroads' obligation.

The Stock Yards are named in the railroads' tariffs as a specific station to which the railroad rates to Chicago are applicable. The line-haul railroads publish an allowance to the Yard Company of $1.25 per single-deck car, and $1.50 per double-deck car, for unloading livestock. The Yard Company also files with the Interstate Commerce Commission its tariff which publishes the same amounts as charges for unloading the livestock "as carrier's agent." Since unloading is required by statute as a part of the transportation service, the filing of the

---

[8] *Adams* v. *Mills, supra; Atchison, T. & S. F. Ry. Co.* v. *United States,* 295 U. S. 193; *Armour & Co.* v. *Alton R. Co., supra.*

terms on which it is performed is manifestly proper, although shippers are not concerned with the charge because the railroads absorb it in the line-haul rate. Because the Yard Company in this specific and limited matter acts as agent for the railroads, and in the performance of that transportation service is subject to the jurisdiction of the Interstate Commerce Commission, it does not follow that the Commission may regulate, either directly or somehow, through the railroads, the other practices and charges of the Yard Company.

If the Yard Company is in the dual position of being at once the agent of the carriers for the unloading of the stock and the principal in rendering any subsequent services, so is it under dual regulatory schemes and authorities. In so far as it is an agency in transportation, it is subject to the Interstate Commerce Act and to the control of the Interstate Commerce Commission. In so far as it performs stockyard services, it is subject to the Packers and Stockyards Act and to the regulation of the Secretary of Agriculture. The statutes clearly disclose an intention that jurisdiction of the Secretary of Agriculture over stockyard services shall not overlap that of the Commission over transportation.[9] The boundary between the two is the place where transportation ends, and in this case that is established to be the unloading pens.

The Union Stock Yards are a public utility. The decision of the Commission that the transportation ends with unloading leaves the stock in the hands of a public utility—the Union Stock Yards—for delivery to the consignee. Neither the Interstate Commerce Commission nor this Court can assume that the charges or practices

---

[9] Section 406 of the Packers and Stockyards Act provides in part: "Nothing in this Act shall affect the power or jurisdiction of the Interstate Commerce Commission, nor confer upon the Secretary concurrent power or jurisdiction over any matter within the power or jurisdiction of such Commission." 42 Stat. 169, 7 U. S. C. § 226.

of that utility are unfair or unreasonable, that it is charging for services that are not performed or facilities not used, or that it is imposing on consignees unnecessary services. Nor can the Commission or this Court assume that, if unreasonable practices or charges are imposed by this utility, the Secretary of Agriculture would fail to correct them upon an appropriate complaint in a proceeding in which the Yard Company is a party and may defend its practices for itself. In any event, Congress has provided that the Secretary of Agriculture is the forum in which such charges and practices may be questioned and may be weighed in the interest, not only of the packers, but of others who use the Yards and markets and who might be affected competitively by granting the packers' present demands. Congress has established an appropriate forum in which any complaint of the packers against the real party in interest may be heard and any lawful grievances adjusted, and the Commission was quite right in refusing to trespass upon its jurisdiction.

It follows that the decree below should be and hereby is

*Affirmed.*

MR. JUSTICE DOUGLAS, dissenting:

The question in this case is not where the transportation ends but what the particular transportation service includes. I do not suppose that it would be contended that a railroad could lawfully exact from a passenger who had alighted on the station platform an extra charge for passing through the station to the street. The reason why it could not make that exaction is that, although the transportation ended at the platform, the transportation service included free egress from the station. I think that that principle is applicable and controlling here.

*Covington Stock-Yards Co.* v. *Keith,* 139 U. S. 128, which arose prior to the Interstate Commerce Act, applied that

principle to the delivery of livestock at stockyards. This Court, after stating that a carrier of livestock has no right "to make a special charge for merely receiving or merely delivering such stock, in and through stock yards provided by itself," added (pp. 135–136): "If the carrier may not make such special charges in respect to stock yards which itself owns, maintains or controls, it cannot invest another corporation or company with authority to impose burdens of that kind upon shippers and consignees. The transportation of livestock begins with their delivery to the carrier to be loaded upon its cars, and ends only after the stock is unloaded and delivered, or offered to be delivered, to the consignee, if to be found, at such place as admits of their being safely taken into possession."

So far as I am aware, the *Covington* case has never been overruled. As recently as 1939 we approved it. For we stated in *Union Stock Yard Co.* v. *United States*, 308 U. S. 213, 219, after reviewing §§ 1 (3) and 15 (5) of the Interstate Commerce Act: "Without the aid of these statutes the transportation of livestock by rail was held to begin with its delivery to the carrier for loading onto its cars, and to end only after unloading for delivery or tender to the consignee at the place of destination. *Covington Stock-Yards Co.* v. *Keith,* 139 U. S. 128, 136. The same rule has been repeatedly applied since the statute was adopted. *Erie R. Co.* v. *Shuart,* 250 U. S. 465, 468; *Atchison, T. & S. F. Ry. Co.* v. *United States,* 295 U. S. 193, 198, and cases cited; *Denver Union Stock Yard Co.* v. *United States,* 304 U. S. 470; 2 Hutchison, Carriers, 3d ed. § 510."

*Atchison, T. & S. F. Ry. Co.* v. *United States,* 295 U. S. 193, did not alter that rule. As stated by the majority in that case (295 U. S. p. 200): "The Hygrade Company did not seek and the Commission did not grant relief upon the ground that the carriers failed to provide egress from the unloading pens in the public stockyards to the city streets by means of which consignee's animals might be

removed to its plant. Consignee sought free delivery in cars switched into its plant, but the Commission found the switching charge not unreasonable. Consignee also sought free use of the Yards Company's properties, including the overhead runway to take its animals from holding pens as well as from unloading pens to its plant." And the majority added (p. 201): "Plainly there is an essential difference between the route from unloading pens to consignee's plant and a mere way out to the public highways. Transportation does not include delivery within the Hygrade plant or the furnishing of the properties, overhead runway and all, that are used for that purpose." Although certain general statements in the opinion are not consistent with the rule of the *Covington* case, a unanimous Court recently explained *Atchison, T. & S. F. Ry. Co.* v. *United States* as follows: "There the Commission's order directing the discontinuance of appellant's yardage charge to consignees was set aside on the sole ground that the Commission's findings failed to show that the service for which the charge was made was any part of the loading or unloading services, or otherwise a service which the rail carrier was bound to furnish." *Union Stock Yard Co.* v. *United States, supra,* p. 219. That is amply supported by the reasons given by the majority itself for setting aside the Commission's order in the *Atchison* case: "But the Commission, in respect of the shipments covered by its order, made no definite finding as to what constitutes complete delivery or where transportation ends. Its report does not disclose the basic facts on which it made the challenged order. This court will not search the record to ascertain whether, by use of what there may be found, general and ambiguous statements in the report intended to serve as findings may by construction be given a meaning sufficiently definite and certain to constitute a valid basis for the order." 295 U. S. pp. 201-202. And *Armour & Co.* v. *Alton R. Co.,* 312 U. S. 195, did not weaken the rule

of the *Covington* case. We merely held in that case that the complaint of a packer who sought to be rid of "yardage charges" raised certain administrative problems necessitating primary resort to the Interstate Commerce Commission. We did not reach in that case the merits of that controversy nor the questions of law involved here.[1]

Hence, I think we reach the question of the application of the rule of the *Covington* case to this situation unembarrassed by a prior holding.

I do not agree that Congress has left to the Commission the power to eliminate free egress from this particular transportation service. Whatever may have been the scope of the authority of the Commission prior to the Transportation Act of 1920 (*Adams* v. *Mills*, 286 U. S. 397), it should be noted that Mr. Justice Brandeis, the author of *Adams* v. *Mills,* joined in the dissenting opinion in the *Atchison* case, which repudiated the notion that the transportation service in this type of shipment was completed at the unloading pens. Furthermore, as stated in the dissenting opinion in the *Atchison* case, it is clear that Congress itself provided a rule, in § 15 (5) of that Act, which placed on the Commission the duty and the author-

---

[1] It will not do to say that, if the rule of the *Covington* case applied, we erred in requiring primary resort to the Commission in the *Armour* case. There were several questions relating to complex transportations involved in that case which required primary determination by the Commission. They included possible readjustments of rate schedules, possible refunds to shippers, and definition of the boundaries of the station named in the tariff. The statement in the *Armour* case that the statute did not mark the point where the transportation service was completed "under all circumstances and conditions and in all cases" (312 U. S. p. 200) is borne out by the *Atchison* case, where the consignee, as we have noted, sought free delivery in cars switched into its plant and the use of an overhead runway from holding pens to its plant. Clearly, a determination of the precise facts concerning the characteristics and use of a particular station was necessary before a correct application of the applicable rule of law could be made.

ity to see to it that tribute was not exacted from a shipper by exaction of a separate charge for egress from the station to the street or other public place. 41 Stat. 456, 486, 49 U. S. C. § 15 (5). That section, so far as material here, provides that transportation wholly by railroad of ordinary livestock in carload lots received at public stockyards "shall include all necessary service of unloading and . . . delivery at public stockyards of inbound shipments into suitable pens . . . without extra charge therefor to the shipper, consignee, or owner . . ." To say that carriers need not furnish facilities for delivery and immediate removal of livestock by the consignee, without extra charge, is to give § 15 (5) an interpretation which is not only "ingenious" (*Atchison, T. & S. F. Ry. Co.* v. *United States, supra,* p. 205, dissenting opinion) but which is also quite oblivious of the crying abuses which § 15 (5) was designed to correct. The words "all necessary service of unloading and . . . delivery" of livestock at public stockyards must be taken to include all services at a terminal incidental to obtaining delivery of the livestock. Any delivery "into suitable pens" must be taken "to mean pens to which the consignees may gain unimpeded access for the purpose of removing their stock." *Id.,* p. 206. As stated by Commissioner Eastman in Hygrade Food Products Corp. *v.* Atchison, T. & S. F. Ry. Co., 195 I. C. C. 553, 559, pens are not "suitable," within the meaning of § 15 (5), where they do not "permit of reasonable opportunity to accept delivery and remove the livestock from the premises after notice of arrival." Otherwise, the purpose of § 15 (5) in removing "an old evil" is defeated and "a crop of new ones" is sanctioned "by giving stock yards and rail carriers of livestock *carte blanche* to impose vexatious charges which for more than thirty years had been condemned by this Court." *Atchison, T. & S. F. Ry. Co.* v. *United States, supra,* 295 U. S. at p. 206, dissenting opinion.

The legislative history of § 15 (5) was reviewed in the dissenting opinion in the *Atchison* case. 295 U. S. at pp. 207–208. The mandate contained in § 15 (5) originated with the American National Live Stock Association (59 Cong. Rec. 674) and the National Live Stock Shippers' League. Hearings, Committee on Interstate and Foreign Commerce, H. R. 4378, 66th Cong., 1st Sess., Vol. I, pp. 139–141. The proposal was not vague. It was that there be "one through rate on live stock for the whole services from point of origin to the destination at public stockyards used at market place which shall include unloading into suitable pens and delivery therein at such stockyards, where the animals may be counted and checked, including such facilities as are necessary or in use for making such delivery." *Id.*, p. 141. It was the enactment of the rule of the *Covington* case which was specifically asked. *Id.*, p. 874. The argument was that a railroad would not "make two rates to its own pens if it owned and operated them, and neither should it do so with respect to pens which it uses in the same manner. There should be one fare, the same as a passenger rate, to such depot as they use in a given city." *Id.*, p. 881. The record shows that Congress was alive to the evils of which the shippers complained and that it endeavored to correct them. As stated by the House Managers, the aim of the amendment introduced in the Senate and amplified in Conference was to provide that the "through rates on live stock should include unloading and other incidental charges." 59 Cong. Rec. 3264. Indeed, the sole purpose of the amendment was to impose on the Commission the duty and authority to eliminate the practices condemned by the *Covington* case. In view of that explicit history, it comes as a surprise that the Commission can now abdicate and say that a consignee or owner who has paid a through rate may not have free receipt of his stock at the station. To hold that

the separate charge for unloading livestock into pens, which § 15 (5) outlawed, may now be exacted for taking the livestock out, is to make the relief afforded by that section illusory indeed.

But it is said that the matter is subject to the Packers and Stockyards Act of 1921 and that, if relief is to be had, the Secretary of Agriculture must give it. The difficulty with that view is that that Act provides, "Nothing in this Act shall affect the power or jurisdiction of the Interstate Commerce Commission, nor confer upon the Secretary concurrent power or jurisdiction over any matter within the power or jurisdiction of such Commission." 42 Stat. 169, 7 U. S. C. § 226. The boundary between the Commission and the Secretary of Agriculture is not the place where the transportation ends but the time when the transportation service is completed. It is not completed until the consignee has unimpeded access to the station for the purpose of removing the livestock. That view is supported by *Union Stock Yard Co.* v. *United States, supra,* where the stockyards argued that their loading and unloading services were subject to regulation by the Secretary of Agriculture and not by the Commission. We held that loading and unloading services were "common carrier services placed under the authority of the Commission by the Interstate Commerce Act." 308 U. S. p. 221. And we defined the scope of those services in terms of the rule of the *Covington* case. *Id.,* p. 219. To call the withholding of the stock until an additional fee is paid a stockyard "service," is indeed incongruous. It is to forget over half a century of history. It is to take away part of the protection which Congress afforded shippers by § 15 (5). It is to interpret § 15 (5) not liberally, as a remedial provision, but strictly against the stock raisers for whose ultimate benefit it was passed. For years the carriers and stockyards persistently sought to dignify this type of trib-

ute and exploitation as a "stock yard service." Until the present, they were unsuccessful. They should fail again. The *Covington* case states the correct rule. It is that rule which Congress enacted into § 15 (5) for the protection of the stock raisers, who ultimately pay the tribute and vexatious charges which the middleman exacts. It is that rule which we should enforce, until Congress changes it.

The Interstate Commerce Commission followed that rule in Hygrade Food Products Corp. *v.* Atchison, T. & S. F. Ry Co., 195 I. C. C. 553. That case met with reversal here. *Atchison, T. & S. F. Ry. Co.* v. *United States, supra.* And the opinion of the Court contained a *dictum* that "Usage and physical conditions combined definitely to end transportation, at least in respect of these shipments, with unloading into suitable pens as is now required by § 15 (5)." 295 U. S. p. 201. It is that *dictum* which has haunted this litigation and which largely shaped the ruling of the Commission in the instant case. For the Commission proceeded from the premise that there was "no difference in principle" between the *Atchison* case and this one, and that this Court had stated in the earlier case "that the obligation of the line-haul carriers ceased when the animals were placed in the unloading pens." 238 I. C. C. 179, 189–190, 196. But the Commission was under no such compulsion. Commissioner Alldredge was quite right when he pointed out in his dissenting opinion that the Commission misconstrued the opinion of this Court in the *Atchison* case. 238 I. C. C. pp. 197–198. Hence the conclusion of the Commission, reached in large measure under the compulsion of that erroneous assumption, should not be given the weight normally due findings and conclusions of such an expert body.

We should reaffirm once more the rule of the *Covington* case and reject the *dictum* in the *Atchison* case. We should hold that § 15 (5) is remedial and should be liberally construed and, as the Commission itself held in the

*Atchison* case, that this particular transportation service includes the time-honored opportunity of the consignee or owner to go to the station and take away his livestock without payment of an additional toll.

The CHIEF JUSTICE and MR. JUSTICE MURPHY join in this dissent.