SCHMITT et al. v. WAR EMERGENCY PIPELINES, Inc., et al.

Civ. A. Nos. 1328, 1351, 1409.

District Court, E. D. Arkansas, W. D.
June 16, 1947.

Malcom W. Gannaway and Robert M. Gannaway, both of Little Rock, Ark., for plaintiffs.

John W. Barron and Rose, Dobyns, Meek & House, all of Little Rock, Ark., for defendants.

TRIMBLE, District Judge.

At the threshold of this case the Court is met by the jurisdictional inquiry: Whether War Emergency Pipelines, Inc., the employer, was exempt from the overtime provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., as being a pipeline.

Plaintiffs in their original brief state the issue thus: "As a further defense, defendants allege that if plaintiffs were engaged in commerce or the production of goods for commerce, they are still exempt from the overtime provisions of the Fair Labor Standards Act because, it is alleged that the defendant WEP (War Emergency Pipelines, Inc.) was a pipe line company and subject to the provisions of Part I of the Interstate Commerce Act, 49 U.S.C.A. §§ 1–27."

While plaintiffs make this clear and succinct statement of defendants' contention, in their original brief they wholly disregard the question thereafter and do not dis-

cuss it one way or the other, the burden being upon the defendant to establish this defense. Defendants then filed their brief in which they argued the question at length, and earnestly urged this defense, and cited cases for the purpose of supporting their contention.

By an amendment to the Reconstruction Finance Corporation Act, under date of June 25, 1940, it is provided that the Reconstruction Finance Corporation, at the request of the Federal Loan Administrator, and with the approval of the President, shall have power to create corporations, with power in those corporations to produce, acquire, sell or otherwise deal in critical materials, as provided and defined by the President; to purchase and lease lands and equipment, machinery, etc.; to engage in the manufacture and production of materials designated by the President as deemed necessary in the National Emergency. 15 U.S.C.A. § 606b (3).

Under this authority two corporations were created, denominated respectively (1) Defense Plant Corporation, whose chief function was to arrange for the physical construction of plants throughout the country to produce critical and strategic war materials, and (2) Defense Supplies Corporation, whose chief function was to attend to the matter of acquisition of strategic and critical raw materials and supplies, and their distribution, particularly to manufacturing plants and locations where needed.

Prior to the dates involved herein, a number of the major oil companies in the United States, realizing the probability and danger of a serious shortage of petroleum and petroleum products on the Eastern Seaboard, made a survey of two routes which were thought to be feasible or adapted to pipe lines, from the oil fields of Texas, and the southwest, to the Eastern Seaboard, but, on account of the oil companies' inability to get the steel for the construction they were unable to build either of these lines. Thereupon, through an understanding and agreement with the Reconstruction Finance Corporation, Defense Plant Corporation, and Defense Supplies Corporation, the War Emergency Pipelines, Inc., was organized under the laws of the State of Delaware. All of the stock in that corporation was held by the major oil companies of the country. Thereupon War Emergency Pipelines, Inc., received from the major oil companies all the data they had with reference to the proposed lines, including surveys, aerial surveys, plans, specifications, and in addition, War Emergency Pipelines, Inc., was in general staffed by trained and experienced personnel furnished by the major oil companies, which personnel was experienced in the laying of pipe lines and the building of structures necessary to the operation of pipe lines. Throughout the period of its history War Emergency Pipelines, Inc., operated wholly on capital which was furnished to it through Defense Plant Corporation or Defense Supplies Corporation.

On June 26, 1942, War Emergency Pipelines, Inc., made a contract with Defense Plant Corporation, pursuant to which the former agreed to enter into contracts necessary for the construction of a 24-in. pipe line (commonly and popularly known as the "Big Inch"), from Longview, Texas, to Salem, Illinois, and on November 12, 1942, the contract was amended in order to extend the pipe line to Bayonne, New Jersey, and Philadelphia, Pennsylvania.

On February 10, 1943, upon findings of necessity and the recommendations of the Petroleum Administration for War, a similar contract was made between the same parties looking toward the construction of a 20-inch pipe line (commonly and popularly known as the "Little Big Inch") commencing in the Houston, Texas, area, and terminating in the vicinity of Seymour, Indiana, and, on April 27, 1943, for good and sufficient reasons, this contract was amended to extend this line to the New York Harbor area.

In all of the contracts looking toward construction, Defense Plant Corporation agreed to and did provide financing, and the contracts also provided or had in contemplation that War Emergency Pipelines, Inc., would operate the pipe line upon completion. Under the provisions of these contracts title to the pipe lines was in and remained in Defense Plant Corporation.

By written agreement the pipe lines were leased for operation to Defense Supplies

Corporation, by the Defense Plant Corporation. Then by a document called "Agency Agreement," Defense Supplies Corporation constituted Emergency Pipelines, Inc., its agent to manage, operate and maintain the pipe lines. In thus delegating operating function to War Emergency Pipelines, Inc., it was, among other things, provided that the latter should not make or receive any profit, fee or commission out of the operations.

After completion of the pipe lines War Emergency Pipelines, Inc., in the name of, and acting as agent for Defense Supplies Corporation, purchased petroleum or petroleum products at the origins of the respective pipe lines, at OPA prices, and as such agent delivered and sold the through-put at the respective terminii. The sales price was cost plus a sum specified by Defense Supplies Corporation. The Petroleum Administration for War issued directives to all pipe line companies, among them and including War Emergency Pipelines, Inc., which, among other things, designated from whom products should be purchased and to whom they should be sold. Effective July 1, 1945, Defense Plant Corporation and Defense Supplies Corporation were dissolved by joint resolution of Congress, and their assets and liabilities were transferred to Reconstruction Finance Corporation. The pipe lines were relinquished to Reconstruction Finance Corporation on January 31, 1946.

This states briefly the facts upon which defendants contend that War Emergency Pipelines, Inc., was subject to Part I of the Interstate Commerce Act, and, therefore, its employees exempt from the provisions of the Fair Labor Standards Act, because it was a pipe line company.

■ This action is based upon the provisions of the Fair Labor Standards Act of 1938, and amendments. That Act provides: "The provisions of Section 7 shall not apply with respect to  *  *  *; (2) *any* employee of an employer subject to the provisions of Part I of the Interstate Commerce Act." 29 U.S.C.A. § 213(b) (1).

From this it clearly appears that it is not the status of the employee which controls, and which exempts him, but the status of the employer. Even should it appear that the employee himself is engaged in commerce or in the production of goods necessary for commerce, if the employer is subject to the provisions of Part I of the Interstate Commerce Act, then the employee is exempt from the overtime provisions of the Fair Labor Standards Act. This language is so plain that it needs no construction or citation of authorities, in fact, no one would be so rash as to attempt to construe this plain and unambiguous language. So if the War Emergency Pipelines, Inc., was subject to the provisions of Part I of the Interstate Commerce Act, then the provisions of Section 7 of the Fair Labor Standards Act will not apply to its employees.

The Interstate Commerce Act provides:

"The provisions of this chapter shall apply to common carriers engaged in  *  *  *

"(b) the transportation of oil or other commodity  *  *  * by pipe line, or partly by pipe line and partly by railroad or by water; from one State  *  *  * to any other State  *  *  *." 49 U.S.C.A. § I(1) (b).

"The term 'common carrier' as used in this chapter shall include all pipe-line companies; express companies; sleeping-car companies; and all persons, natural or artificial, engaged in such transportation as aforesaid as common carriers for hire." 49 U.S.C.A. § I(1) (a).

While it is conceded by defendants that the War Emergency Pipelines, Inc., is not what is commonly called a "Common Carrier," it says: "but, nevertheless, under the plain language of Section I of the Interstate Commerce Act it did not have to be a common carrier in order to be subject to the Interstate Commerce Commission."

There are but few cases to be found in the reports bearing directly upon the issue here. That issue stated in its simplest form is this: Was War Emergency Pipelines, Inc., a pipe line company? It **is** pleaded and urged by the defendants, and conceded by the plaintiffs, that if the War Emergency Pipelines, Inc., was a pipe line company, then *its* employees are exempt from the overtime provisions of the Fair Labor Standards Act.

Counsel for plaintiffs as well as counsel for defendants cite and rely upon the case of Valvoline Oil Co. v. United States, 1939, 308 U.S. 141, 60 S.Ct. 160, 161, 84 L.Ed. 151, but they disagree sharply upon the interpretation of the holdings in that case. The difference in interpretation offered and contended for by the respective parties is, that plaintiffs contend that the Supreme Court in that case held the appellant, Valvoline, to be a pipe line company, because it was the owner of the pipe line, and the defendants contend that under the decision and holdings in that case it is immaterial who owns the line as the statute applies to "carriers engaged in (b) transportation of oil or other commodity by pipe line, or partly by pipe line and partly by rail, road or water; from one state to another state."

Is War Emergency Pipelines, Inc., a pipe line company even though it does not own the pipe line, but is engaged in the transportation of oil as a carrier from one state to another state, for a disclosed principal?

In the case of Valvoline Oil Co. v. United States, supra, in stating the facts the court said: "The Valvoline Oil Company appeals from the final decree of a three-judge district court for the Western District of Pennsylvania, under the Urgent Deficiencies Act, dismissing a petition to enjoin and annul an order of the Interstate Commerce Commission. 25 F.Supp. 460. The order, requiring appellant to file with the Commission certain maps, charts and schedules of its pipe-line properties for use in valuing the properties under Section 19a of the Interstate Commerce Act, 49 U.S.C.A. § 19a, was made after a determination by the Commission that appellant *was 'engaged in the transportation of oil by pipe line in interstate commerce and that it is a common carrier* subject to the provisions of the Interstate Commerce Act.'" (Emphasis supplied.)

Speaking further the court in the same case said: "The appellant relies upon the Pipe Line Cases to show that the present act does not cover a pipe line transporting oil for its own refining purposes only. The discussion referred to is that concerning the Uncle Sam Oil Company. But that company's pipe line was used for the 'sole purpose of conducting oil from its own wells to its own refinery.' This was held not to be transportation under the Act. *Here, however, it is the purchase from many sources and subsequent carriage that determine the applicability of the statute to Valvoline.*"

Section 1(3) (a) of the Act makes it very plain as to the meaning of the Act. So "The term 'common carrier' as used in this chapter shall include all pipe-line companies * * *. Wherever the word 'carrier' is used in this chapter it shall be held to mean 'common carrier.' * * * The term 'transportation' as used in this chapter shall include * * * all instrumentalities and facilities of shipment or carriage, *irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, * * * and handling of property transported.*"

■ This plain and explicit language of the statute brings within its orbit and ambit all those who are engaged in transportation of oil by pipe line, irrespective of who owns the facilities of transportation or the property transported.

Section 10 of 49 U.S.C.A., which is also Section 10 of the Act, shows with greater clarity the coverage of the Act: "Any common carrier subject to the provisions of this chapter * * * or any * * * lessee, agent, or person acting for or employed by such corporation * * *" are made criminally responsible for any violation of the Act.

While the last quoted section of the Act bears upon criminal liability, it shows the intent of Congress to include within the coverage all persons engaged in transportation, regardless of ownership.

That ownership of facilities is not the criterion by which coverage under the Act is determined, see Swift & Co. v. United States, 316 U.S. 216, 62 S.Ct. 948, 86 L.Ed. 1391; Powell v. United States, 300 U.S. 276, 57 S.Ct. 470, 81 L.Ed. 643; Ellis v. Interstate Commerce Commission, 237 U.S. 434, 35 S.Ct. 645, 59 L.Ed. 1036; United States v. Union Stockyards, 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226.

In Powell v. United States, supra, the railroad, which was largely within the con-

160

fines of Fort Benning, Georgia, was the property of the United States, and was leased to individuals who agreed to act as agents for the Central of Georgia Railroad in reference to deliveries to the Fort. It was held that because these individuals were engaged in transportation they were subject to the jurisdiction of the Interstate Commerce Commission, regardless of ownership.

The defendant War Emergency Pipelines, Inc., was engaged in transportation of oil by pipe line from one state to another state, was a common carrier under the Act, therefore is a pipe line company, and consequently is subject to the jurisdiction of the Interstate Commerce Commission. That being true its employees are exempt by reason of the Provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 213(b) (1), and this Court is without jurisdiction.