**CHICAGO, B. & Q. R. CO. et al. v. UNITED STATES et al.**

**Civ. A. No. 51 C 613.**

United States District Court
N. D. Illinois, E. D.

June 1, 1951.

Harry E. Boe, R. B. Elster, J. E. Goggin, Eldon Martin and James A. Gillen, all of Chicago, Ill., for plaintiffs.

Warren H. Wagner, Washington, D. C., and Frank W. Sullivan, Chicago, Ill., Mayer, Meyer, Austrian & Platt, Chicago, Ill., for intervenor John Morrell and Co.

Otto Kerner, Jr., U. S. Atty., Chicago, Ill., and William McFarlane, Washington, D. C., for the United States.

Allen Crenshaw, Washington, D. C., for the Commission.

Before LINDLEY, Circuit Judge, BARNES, Chief District Judge and IGOE, District Judge.

LINDLEY, Circuit Judge.

This is a suit by the railroads serving John Morrell & Company, the intervener, to set aside the Interstate Commerce Commission's report and order of March 12, 1951, entered in the proceeding known as John Morrell & Company, Terminal Allowance, Ex Parte 104, Practices of Carriers Respecting Operating Revenues and Expenses, Part II Terminal Services. The report reaffirmed the Commission's prior findings to the effect that the plaintiffs' common carrier obligations under their interstate line-haul rates do not extend beyond certain interchange tracks described in the prior reports of Division 3 of the Commission and that carrier payment of an allowance to the industry for performing switching service beyond those interchange tracks or carrier spotting of livestock cars beyond such tracks without compensatory charges in addition to the established line-haul rate was unlawful, and ordered plaintiffs to cease and desist from engaging in such practices.

The Commission instituted the original Ex Parte No. 104 proceeding, an investigation of Practices of Carriers Affecting Operating Revenues or Expenses, Part II, Terminal Services, on July 6, 1931. In its report of May 14, 1935, 209 I.C.C. 11, the Commission found that when a carrier is prevented from performing an uninterrupted service to loading or unloading points within a plant area by reason of some action or disability of the industry or its plant, the carrier's duty with respect to delivery or receipt of cars ends at the point of interruption or interference, and that any allowance to the industry for performing service beyond such point or performance

thereof by the carrier without a charge over and above its line-haul rate was unlawful, in violation of Section 6 of the Interstate Commerce Act, 49 U.S.C.A. § 6. A similar finding of illegality was made with respect to the payment of an allowance for or carrier performance of plant spotting service in excess of the service required in making a simple placement or in teamtrack spotting. The instant case brings up for review the forty-eighth supplementary proceeding applying the general principles laid down by the Commission in the original Ex Parte No. 104 report. This proceeding, with respect to which Division 3 made its first report on May 8, 1936 (215. I.C.C. 431), has extended over a 16 year period during which four different hearings have been accorded the railroads and the intervener. The Division's intermediate decisions are reported at 263 I.C.C. 69 and 277 I.C.C. 173; the Commission's final report and order, entered March 12, 1951, is as yet unreported. The plaintiffs and the intervener contend that the Commission's order directing the carriers to cease paying allowances to Morrell on the cars handled by the industry's engine beyond the interchange tracks and making deliveries beyond said tracks without the assessment of a proper charge is arbitrary and capricious, without substantial support in the evidence and, therefore, beyond the Commission's power.

The intervener, John Morrell & Company, operates a meat packing plant in Ottumwa, Iowa, located in the Ottumwa Switching District. Since the plant was established in 1877, it has been served directly by the lines of the Burlington, Milwaukee and Rock Island and indirectly by the Wabash.[1] Each of the three carriers directly serving the plant has sidings and spur tracks within the plant area, the Burlington entering from the northwest, the Milwaukee from the southwest and the Rock Island from the northeast, and the industry has additional trackage of its own. Traffic at the Morrell plant consists principally of outbound carloads of fresh meats and packing house products and inbound carloads of livestock. Approximately 90% of the livestock is delivered at unloading pens within the plant by the carriers with their own engines at night when the plant is not in operation. Daytime traffic into and out of the plant, moving between the carriers' interchange tracks and the loading and unloading points within the plant area, is handled by the industry's engine, the carriers paying the industry an allowance, based on actual cost, up to a maximum of $2.50 per car. The order sought to be enjoined, which is based on the conclusion "that the line-haul carriers could not deliver and remove empty and loaded cars at the various loading and unloading points in the plant in uninterrupted movements at their operating convenience and that under the conditions set forth, services beyond the interchange tracks were in excess of the services respondents were required to perform at their line-haul rates", would require plaintiffs (1) to cease making livestock deliveries at the unloading pens unless an extra charge is assessed for performance of the spotting service beyond the interchange tracks and (2) to discontinue paying allowances to the industry on cars handled by the industry's engine.

Inasmuch as it is well settled that the Commission is authorized to determine the points at which transportation begins and ends and to prohibit the performance of services not embraced therein,[2] it follows that the principal question for determina-

1. Carload traffic moving to and from the Morrell plant via the line of the Wabash is handled by the Milwaukee over its tracks between the plant and the connection of the Milwaukee and the Wabash about two miles west of the plant.

2. See United States v. American Sheet & Tin Plate Co., 301 U.S. 402, at page 408, 57 S.Ct. 804, at page 807, 81 L.Ed. 1186, in which the Supreme Court, approving the general principles announced by the Commission in its original report in Ex Parte No. 104, stated, "The Commission is clearly empowered to determine what is embraced within the service of transportation and what lies outside that service. Since the Commission finds that the carriers' service of transportation is complete upon delivery to the industries' interchange tracks, and that spotting within the plants is not included in the service for which the line-haul rates were fixed, there is power

tion by this court is whether the evidence before the Commission was sufficient to warrant its conclusion that the circumstances existing at the Morrell plant constituted plant interference or interruption within the meaning of the principles announced in Ex Parte No. 104, supra, and approved by the Supreme Court in United States v. American Sheet & Tin Plate Co., 301 U.S. 402, 57 S.Ct. 804, 81 L.Ed. 1186.[3] The carriers contend that there is no evidence to support a finding of an interruption in or interference with terminal service caused by the desires or disabilities of the industry, as contemplated in the Commission's decision in Ex Parte No. 104. They assert that the Commission's finding that they could not perform the necessary spotting service at the Morrell plant at their convenience without interfering with each other is based on an hypothetical situation rather than on the actual facts of the case and that it is contrary to the "only testimony of record by railroad operating men". The testimony referred to was to the effect that, with the industry's engine handling the daytime switching operations and the carriers' engines spotting livestock shipments only during the hours when the plant and the industry's engine were not in operation, there had been no interference in the past. However, the maps which were introduced in evidence, showing the complete track layout and the location of the various loading and unloading points within the Morrell plant, considered in conjunction with the reports of the Commission's inspectors who had made on-the-spot studies of the terminal service practices and facilities at the plant, would certainly seem to provide ample evidentiary support for the Commis-

sion's findings that the plant's facilities are insufficient for the carriers to make deliveries at their convenience without interference from one another and from the industry's engine.

Even so, say the carriers and the intervener, inasmuch as the plant facilities have not been found to be inadequate for terminal use by one carrier alone, the potential interference which might materialize, if each of the carriers spotted for unloading all of the cars hauled by it, should not be said to constitute a plant disability within the meaning of the Commission's report in the original Ex Parte No. 104 proceeding, since so to hold would be to make the extent of a carrier's obligations under its line-haul rates dependent on the number of carriers serving the Morrell plant rather than on the nature of the plant's physical facilities. And they point to the statutory provision authorizing carrier pooling of traffic and service, Section 5(1) of the Interstate Commerce Act, 49 U.S.C.A. § 5(1), as indicative of the impropriety of such a result. Their argument overlooks, we think, the fact that the Commission's findings with respect to plant disability and interference rest not alone on the fact that the Morrell plant is served by more than one carrier but are based also on the diversity of ownership of the tracks within the plant area, which makes it impossible for any one carrier to serve all the plant loading and unloading points without using or crossing tracks of the other carriers, and on the even more significant fact that the industry's switching engine, which is in operation from 6:30 a. m. to 7:00 p. m. six days each week, interferes with daytime carrier movements within the plant area. In the light of

---

to enjoin the performance of that additional service or the making of an allowance to the industry which performs it."

**3.** CF. Interstate Commerce Commission v. Hoboken Manufacturer's Railroad Co., 320 U.S. 368, at page 378, 64 S.Ct. 159, at page 164, 88 L.Ed. 107, where the court observed: "The Commission's determination of the point in time and space at which a carrier's transportation service begins or ends is an administrative finding which, if supported by evidence, is conclusive on the courts. Los

Angeles Switching Case, (I. C. C. v. Atchison T. & S. F. R. Co.) 234 U.S. 294, 311–314, 34 S.Ct. 814, 818, 819, 58 L.Ed. 1319; United States v. American Sheet & Tin Plate Co., 301 U.S. 402, 408, 57 S.Ct. 804, 807, 81 L.Ed. 1186; United States v. Pan American Petroleum Corp., 304 U.S. 156, 158, 58 S.Ct. 771, 773, 82 L.Ed. 1262; Baltimore & Ohio R. Co. v. United States, 305 U.S. 507, 525–526, 59 S.Ct. 284, 291, 83 L.Ed. 318; Swift & Co. v. United States, 316 U.S. 216, 222–225, 62 S.Ct. 948, 951, 86 L.Ed. 1391 and cases cited."

these facts and circumstances, the Commission's findings as to interference and disability cannot be set aside as arbitrary or otherwise impugned by reason of the fact that, in practice, a combination of nighttime carrier switching and daytime switching by the industry's own engine, for which switching service the industry has been paid allowances by the carriers, has prevented the realization of the potential interference inherent in the existing situation.[4]

The intervener contends that, because the Commission failed to make an express finding as to whether spotting service is or is not included in the line-haul rates involved in this proceeding, its order cannot stand. But it must be remembered that this proceeding is supplementary to the original Ex Parte No. 104 proceeding, in which, as the Supreme Court observed in the Tin Plate case, supra, 301 U.S. 402, at page 404, 57 S.Ct. 804 at page 806, "The Commission found that line-haul rates had not been fixed to compensate the carrriers for the performance of the service in question". That finding must be given effect in a proceeding such as this, which grows out of the original proceeding and involves nothing more than the application of the general principles announced therein to the facts of the particular case.

As to the intervener's contentions with respect to a carrier's duty to furnish cars and to make delivery thereof at points suitable to the shipper, contentions which, concerned as they are with the duties and obligations of a carrier under a line-haul rate, are directed against the Commission's determinations in the original Ex Parte No. 104 proceeding, which is not before this court, rather than to the propriety of the application made, in the case at bar, of the principles announced in that proceeding and subsequently approved by the Supreme Court. It was determined in the original proceeding that, where an interference or plant disability prevents an uninterrupted carrier movement to or from loading or unloading points inside a plant area, then interchange tracks on the fringe of the plant area constitute a suitable point for carrier receipt and delivery of cars. And the carriers' arguments that the Commission's order will result in a discriminatory preference of other shippers over Morrell and in undue prejudice to the carriers themselves in competing with their motor carrier rivals for Morrell's business, arguments which have a strong practical appeal and seem to us to cast some doubt on the wisdom of the Commission's decision, seem, nonetheless, to be equally beside the point, for the fact that certain shippers may be receiving unlawful allowances or services does not entitle Morrell or any other shipper to the same or similar unlawful advantages. Nor does the fact that plaintiffs' motor carrier competitors may continue to make deliveries inside the Morrell plant mean that the plaintiffs should be allowed to do so in violation of Section 6(7) of the Interstate Commerce Act.[5]

To the contention that the Commission's order is in direct conflict with the carriers' duties under the Twenty-Eight Hour Law, 45 U.S.C.A. §§ 71–74, and 46 U.S.C.A. §§ 466a and 466b, which, generally speaking, prohibits the confinement of livestock in transit for a period in excess of 28 hours without unloading for water, feed and rest, there appear to be two answers. The first

4. The fact that carrier spotting of livestock cars is done only at night, when neither the plant nor the industry's engine is in operation, certainly does not tend to show that the carriers are able to make deliveries to the unloading pens in uninterrupted movements at their operating convenience but rather would seem to indicate, if anything, a recognition on their part of the fact that interference would be encountered if deliveries were attempted during the hours when the plant and the industry's engine are in operation.

5. It should be remembered that the order here under attack does not prohibit deliveries beyond the interchange tracks but merely requires the assessment of a proper charge for this service, which the Commission has determined is not included in the carriers' obligations under their established line-haul rates unless it can be performed at the carriers' operating convenience and without interruption or interference.

is that the carriers' liability under the statute is terminated on delivery of the livestock, and the Commission, whose function it is to determine when and at what points transportation begins and ends, United States v. Wabash R. Co., 321 U.S. 403, 408, 64 S.Ct. 752, 88 L.Ed. 1225, and as an incident thereto, at what point delivery is complete, has determined that, in the case of shipments to the Morrell plant, delivery is made by moving the cars onto the interchange tracks, at which time and place the carriers' duties under the Twenty-Eight Hour law would seem to be discharged. But, even if we assume that, under the statute, the carriers' liability under the latter Act is not terminated until the livestock cars have been spotted at the point where the consignee desires to unload them, the statute does not indicate that, if the spotting service requires a service in excess of that to which the consignee is entitled under the line-haul rate, no additional charge may be assessed for such additional service. This, then, is the second answer; the Commission's order does not prohibit delivery to the unloading pens inside the plant but requires only that a proper charge be made for such service when performed.

Plaintiffs complain that the fact that the Commission may, in the case of one packing plant, determine that the carriers' obligations under their line-haul rates are fulfilled by placing the livestock cars on an interchange track on the fringe of the plant area while deciding, in the case of another packer, that the carriers' line-haul rate obligations require that the livestock cars be spotted at unloading pens inside the plant not only results in a discriminatory preference of one shipper over another but leaves the carriers in the dark as to what services they are obliged to extend to shippers whose particular cases have not been considered and decided by the Commission. While it is true that the application of the general principles of Ex Parte No. 104 to the facts and circumstances of particular cases may result in *apparent* discriminations as between shippers, those apparent discriminations will vanish when it is seen that, in each case, the shipper is accorded

delivery to such point as it designates if that point can be reached by the carrier in an uninterrupted movement at its operating convenience and, if not, to the point of interruption or interference. Nor are the carriers left without a guide in the case of shippers who have not been investigated by the Commission, for the Commission has indicated (209 I.C.C. 11) that their line-haul obligations do not extend beyond the performance of a spotting service equivalent to that involved in making a simple placement or in teamtrack spotting, thus providing the carriers with a yardstick by which they may measure their obligations to any particular shipper.

We conclude that the Commission's order is supported by substantial evidence. The complaint is dismissed.

The foregoing is made a part of our more formal findings of fact and conclusions of law of even date herewith.